RUTHERFORD et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit.   May 14, 1919.)

No. 239.

CRIMINAL LAW ⬥⬥657—TRIAL.

In a prosecution against the leaders of a religious society, who it was charged had violated the Espionage Act, where the government called members of the society and they proved unwilling witnesses, *held*, that the acts of the trial court in committing such witnesses for contempt, on the theory that they were falsifying when they refused to answer questions, but stated that they did not remember, etc., was under the circumstances so prejudicial to defendants that a new trial should be granted.

Manton, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of New York.

Joseph F. Rutherford and others were convicted of violating Espionage Act June 15, 1917, tit. 1, §§ 3, 4, and they bring error.   Reversed and remanded.

Sparks, Fuller & Stricker, of Brooklyn, N. Y., for plaintiffs in error.

James D. Bell, U. S. Atty., and Charles J. Buchner, Sp. Asst. U. S. Atty., both of Brooklyn, N. Y., and I. R. Oeland, Sp. Asst. Atty. Gen., of New York City.

Before WARD, ROGERS, and MANTON, Circuit Judges.

WARD, Circuit Judge.   This is a writ of error to a judgment of conviction of the defendants, eight in number, indicted for violation of sections 3 and 4, title 1, of the Espionage Act of June 15, 1917 (40 Stat. 219, c. 30 [Comp. St. 1918, §§ 10212c, 10212d]).   Seven of the defendants were sentenced to terms of 20 years and the eighth to a term of 10 years in the federal penitentiary at Atlanta, Ga.   The defendants are members of religious organizations known as the International Bible Students' Association, the People's Pulpit Association, and the Watch Tower Bible & Tract Society, all representing a form of religious doctrine preached from 1870 down to the time of his death in 1916, by a person known as Pastor Russell.   One of these doctrines is an absolute prohibition of the killing of human beings, and so of taking any part at all in war.   The trial continued from June 5

to June 20, 1918. We think there was sufficient evidence upon which to submit the case to the jury, and that none of the errors assigned is ground for reversal, except in respect to the matters now to be considered.

The government called three witnesses, all members of the International Bible Students' Association, Mrs. Mabel Campbell, Mrs. Agnes Hudgings, and William F. Hudgings. They were not willing witnesses, and the court properly allowed the government great latitude in examining them. Mrs. Campbell refused to swear that the carbon copy of a letter submitted to her had been written by her from the dictation of the defendant Van Amburgh. At the conclusion of the examination in chief the court said:

"The court suggests that if the defendants desire to cross-examine this witness that you recall her later. This witness is not discharged, but will remain in attendance. We will take some other witness for the present."

This was, as he subsequently said, to give her an opportunity of taking advice as to her testimony before being recalled for cross-examination. She never was so recalled.

Mrs. Hudgings was called with reference to a letter with a rubber stamp signature, J. F. Rutherford, one of the defendants:

"Q. I hand you Exhibit 11 and ask you if you identify that rubber stamp there as similar to the one that Mr. Rutherford used? A. No, I wouldn't identify that stamp.

"Q. Is there anything peculiar about that? A. I don't understand you.

"Q. Anything peculiar about that rubber stamp there? A. It is the same as all rubber stamps, as far as I know.

"Q. What did he have on the rubber stamp that you knew that he used? A. 'J. F. Rutherford.'

"Q. Was it the same as that (indicating)? A. I think so.

"Q. Looks like that? A. Some.

"Q. You have seen him use it frequently? A. Yes, sir.

"Q. How often? A. Couldn't say.

"Q. Do you see any difference between that and the one that you had seen him use? A. I have not paid such particular attention to it that I would specify.

"Q. I ask you, could you see any difference between that and the one you have seen him use? A. I couldn't answer that question.

"The Court: The court is inclined to think you can, and you must answer it. The question is if you can see any difference, and you must answer that question.

"The Witness: Your honor, I might say—

"The Court: I might say to you, Mrs. Hudgings, that we must have full, true, direct answers to all these questions that are asked you which the court decides are proper. Your answers thus far have seemed to be evasive.

"Mr. Fuller: I except to these remarks of the court on behalf of each of the defendants.

"Mr. Sparks: I ask that the witness be permitted to make the statement that was called out by the court in view of the characterization of the court's question to her. I ask that she be permitted to make her statement for the record.

"The Court: She may make any statement she desires to.

"The Witness: I was about to say that I gave an oath that I would tell the truth and the whole truth as nearly as I was able to, and that I would not identify the stamp for the reason that I could not; that I did not know the stamp plainly enough so I could identify it, and therefore do not wish to give false testimony.

"The Court: This second witness seems to be taking an attitude that the court can't permit to continue. Now, the court has great power as to compelling a witness to answer, and answer directly, and has much power in case a witness is evasive in answering. This is rather extraordinary, and in the case of the other witness I had her withdraw, thinking that likely counsel for the defense would advise her, or some one else. Now, the question here is not for you to identify this stamp; the question was if it looked like the one you saw this person use. Ask the witness whether she was the one that used the stamp in stamping letters.

"Mr. Sparks: I take exception to the court's remarks and the general character of it as tending to make the witness say something which she has already stated she could not do. I take also exception to that part of the court's remarks in which he says that he suggested that the previous witness might be withdrawn in order that counsel for the defense or some one else might advise her, not knowing what counsel could advise her to do in view of her testimony, and in view of the position of counsel for the defendants, that the witness could not possibly answer the questions that were propounded to her by the court and counsel.

"The Court: The court is very much inclined to believe that the former witness could answer the questions, and that the answers that she was giving were not true answers, and, while I would not deal with her hastily, I became convinced, if that was the case, I should deal with the witness for contempt of court, and perhaps in other directions, because that would be the plain duty of the court under such circumstances.

"Mr. Sparks: We take exception to those last remarks of the court, and in view of them we ask for the court to declare a mistrial and the withdrawal of a juror.

"The Court: The motion will be denied, and an exception will be noted on behalf of the defendants."

## After some further testimony the court said:

"We will take a recess here for a few moments, and I ask the witness to examine that letter very carefully with respect to the paragraph and punctuation, the position of the typewriter worked on the paper, the width of the margins on each side, and the place where the typewriting work commences at the top and the place where there is space left at the bottom, where you start your second page there, and take what time you need, and then the court will argue, upon coming in here, whether you wrote that letter or not. Now, take it to the light in a side room by yourself; the court will furnish that, and take what time you want. We will take a little recess while you are doing that. (Short recess.)"

## After recess:

"The Court: Gentlemen of the jury, the court was of the opinion that this witness wrote the letter that it had asked her to examine; that is, wrote it all on the typewriter. On going out counsel on both sides advised me that she did not write the letter, and the court was not justified in asking her to examine it in that view of the situation. So, gentlemen, please draw no unfavorable inference by reason of this error the court made. Counsel was merely inquiring as to the stamp, and I assumed she was the stenographer that wrote the whole letter, so it was the court's error.

"By Mr. Oeland: Q. After you have examined the stamp, what is your best judgment as to whether or not that is one of the stamps used by Mr. Rutherford?

"Mr. Sparks: I object to the form of the question; I object to best judgment. A conviction of the defendants cannot be based upon the witness' best judgment as to any particular fact—

"Q. What do you say, after careful examination, whether this was one of the stamps that were used? A. In all good conscience I could not say if that was one of the stamps that we used.

"Q. Would you say it was not? A. I would not.

"By the Court: Q. What do you most think about it?

"Mr. Sparks: I object to it, as to form. (Objection overruled. Exception.)

"The Witness: I could not answer the question.

"Q. What are you most inclined to think about it? A. I cannot draw any conclusion conscientiously."

The government sought in the case of the witness William F. Hudgings to prove by him the signatures of the defendants Van Amburgh and MacMillan. He was asked:

"Direct examination by Mr. Oeland:

"Q. Do you know the signature of Mr. Van Amburgh? A. I have seen it many times.

"Q. Do you know the signature of MacMillan? A. I have seen it also.

"The Court: Have you seen him write?

"The Witness: I won't say I have seen him write.

"The Court: What is your best recollection as to whether you have seen him write?

"The Witness: I think I have never seen him write.

"The Court: Well, write anything—the signature or not?

"The Witness: I have not watched that.

"The Court: I did not ask you whether you ever saw them write; I want an answer yes or no.

"The Witness: I said 'No.'

"Q. Have you seen letters that they have signed and handed out? A. I have seen checks they have signed themselves, but not letters.

"Q. You have seen checks they signed? A. Yes, sir.

"Q. Is that right? A. Yes, sir.

"The Court: You have been there how many years?

"The Witness: About nine years.

"The Court: Continuously?

"The Witness: Yes, sir.

"The Court: And both these gentlemen have been there in that place of business nine years?

"The Witness: Almost continuously; yes, sir.

"The Court: And you tell us that you have never seen either of them write with a pen or pencil; never seen them in the act of writing?

"The Witness: No, sir; I never stood over their shoulder.

"The Court: I did not ask you where you stood. I asked, during that nine years, you tell us whether, upon your oath, that you never say either of these gentlemen in the act of writing. That is what the court asks you, sir.

"The Witness: I do not remember that I ever saw either of these gentlemen in the act of writing.

"The Court: What is your best recollection whether you ever did or not?

"The Witness: That is my best recollection.

"The Court: Tell us how your workshops, or your different places where you do your work, are located; how often are you in one another's presence?

"The Witness: I am very little in Mr. Van Amburgh's presence. His office is separated by a partition. I am more frequently in Mr. MacMillan's presence, but not to see him do any writing.

"The Court: And when you were in his presence, is he at his desk doing his work?

"The Witness: Part of the time.

"The Court: And during that entire nine years you never happened to see him in the act of writing?

"The Witness: Not that I can now recall. That is my best recollection.

"Q. I hand you Exhibit 31 for identification and ask you if at any time—I will ask you if that is a fac simile, a mimeograph copy of the signatures of MacMillan and Van Amburgh? A. It looks very much like it. * * *

"Q. Looking at the mimeograph signature there, what is your best opinion as to whether or not that is MacMillan's signature? A. It looks very much like Mr. MacMillan's signature."

"Q. What is your best opinion? A. That would be my best opinion, but I might be mistaken.

"Mr. Sparks: I ask the court, in view of the fact that we have sat silent here under this examination of this witness, that it is no part of counsel's duty to suggest to any witness under examination, under the latitude that your honor allowed the government to cross-examine, to suggest or make any objections under the circumstances, and that his failure to recollect shall in no wise be taken as against—that they shall assume no hostile attitude as against the defendants for that reason.

"The Court: The requested instruction is denied.

"Mr. Sparks: Exception.

"The Court: I do not propose to stop and instruct this jury every two minutes, and at the request of the court I think that counsel for the government should ask this witness more about the opportunities and probabilities of his seeing this person write. It is a very extraordinary situation here. Very extraordinary testimony. It is very improbable. * * *

"The Court: Now, Mr. Witness, you do not mean that you have seen him write his signature? Have you ever seen him in the act of writing with a pen, pencil, or whatever the writing may be, or the signing of his name or writing anything else, writing in a book on any kind of book or paper or other material? Now, the question is whether you have ever seen him in the act of writing, not how much or how little, but whether you have ever seen him in the act of writing. That is the question this court wants you to answer.

"The Witness: I cannot answer 'Yes,' unless I knew it was a correct answer. Therefore I cannot answer 'Yes' to that question.

"The Court: Did you know him before you went there to work?

"The Witness: No, sir.

"The Court: So your acquaintance extends for a period of nine years?

"The Witness: Yes, sir.

"The Court: Did you go away on trips with him?

"The Witness: No, sir; not with him.

"The Court: Or in his company?

"The Witness: No, sir; that has probably occurred during the nine years.

"The Court: Been at hotels together?

"The Witness: During conventions I think that has occurred.

"The Court: Why do you say 'think'; don't you remember about that?

"The Witness: I do not recall that I have ever put up at hotels with Mr. Van Amburgh, but I would not say that I have not, because we have many conventions. * * *

"Q. Where was his desk with reference to your desk? A. It was in the same office. not a great distance apart.

"The Court: The same room?

"The Witness: Yes, sir.

"The Court: Your desk is in the same room his desk is in?

"The Witness: It is a very large room, about 20 or 30 desks.

"The Court: It is not so large but that you could see across it?

"The Witness: No, sir.

"Q. How far was your desk away from MacMillan's? A. About 10 feet, I think.

"Q. Anything intervening between you and MacMillan? A. No, sir.

"Q. You could see him sitting at his desk? A. My desk for the greater part has been with my back to Mr. MacMillan's desk, but recently it has been turned so it is alongside; that is, my side is toward Mr. MacMillan's desk, a little in front.

"Q. How far away from him? A. About 10 feet.

"Q. And you have been there within 10 feet of him for a year and a half? A. I guess it is about that long.

"Q. And you have never seen him writing with his pen?

"The Court (interposed): Or pencil?

"The Witness: I cannot say that I can recall that I have ever seen him in the act of writing. I would not say I have not, but I would not say that I have.

"The Court (addressing the clerk): Have you any forms here committing a witness for contempt? Well, you direct the clerk to get up the commitment papers. This witness is going to be committed for contempt of court. The court is thoroughly satisfied, Mr. Witness, that you are testifying falsely when you say that you cannot recall of ever seeing Mr. MacMillan write, and this has happened several times during this trial with other witnesses, especially with your wife. I believe—is that right, Mr. Judge Oeland?

"Mr. Oeland: Yes; she was one of the witnesses.

"The Court: And it becomes the plain duty of the court to commit you to jail, sir, for contempt, and, before doing so, I think it is the duty of the court to explain to you that the answer, 'I do not remember of ever having seen him write,' is just as false, is just as much a contempt of court, if you have seen him write, as it would be for you to say that you had never seen him write, without using the expression, 'I do not remember.' Now, we will adjourn here for a few moments. The court desires you to have every opportunity to correct your answers if you so desire to do so, and the court suggests that it would be very proper for you to talk with a lawyer about the situation. Counsel for the defense or counsel for the government or any one else you may desire to, but I am not going to allow you to obstruct the course of justice here, and if this nation has delegated power enough to this court, and I am very sure it has, to deal with you in the manner proposed, I am going to do it. Now, a good many times a lay witness comes into court with the notion that, if they say they do not remember, that is a complete answer. I desire to inform you that that is not a complete answer, when the fact is that you do remember, or the fact is that you could not fail to remember. Now, we will take a recess for about 10 minutes.

"The Witness: Would it be proper for me to make a statement?

"The Court: You may make a statement, but it would be more prudent, I think, after you confer with some one, because you evidently have a wrong notion of this situation. Now, it is the duty of the court to be indulgent with you, and considerate with you, and give you every opportunity to do right. I would not like to have you, or any one else, think for a moment that that course will not be taken up. You see the situation is a very remarkable one, Mr. Witness, in having a desk in the same room with a man for so long, and transacting so much business with him, and being present when so much business has been transacted by him. The answer that you do not remember of ever seeing him write would be, in the opinion of the court, impossible, and when I say 'impossible,' that is a strong word; but the situation is so remarkable that I feel very sure that I am justified in that. Now, you are the third witness who has taken this course. Is it the fourth witness, Mr. District Attorney?

"Mr. Oeland: This is the third witness, your honor, and the Italian witness.

"The Court: Well, the Italian witness is not very well to be classed with him, I think.

"Mr. Oeland: No; I should not stick to it.

"The Court: And the court has sat here several days listening to this, and it becomes the plain duty of the court to commit you for contempt and deal with you otherwise, if necessary.

"Mr. Sparks: Before the recess I would like to make an objection.

"The Court: Yes; but this is dealing with the witness.

"Mr. Sparks: I understand, but I have the right at any stage of the case to make a motion such as I am going to make.

"The Court: Well, we will hear you.

"Mr. Sparks: In view of the fact that this has occurred at least three times during the trial of this case, and the court has expressed its opinion as to the truthfulness of the witnesses, the witness in each case claiming that they or she were doing the best they could to answer the questions put to them, in view of the fact that they could not state and answer the question from their own knowledge, and in view of the fact that the court has without any doubt indicated to the jury this witness was telling an untruth, and in each case telling them that unless they modify their testimony after an adjournment, I feel that these various occurrences have resulted in great

prejudice to the defendants, and cannot help but affect the jury in their deliberations upon this case, when it finally goes to them, especially in view of the fact that these three witnesses are members of the same organization, that that will have its effect unconsciously, and there is nothing that the court can say to them, in view of these various occasions, which will eradicate this impression from their minds. I also object upon the ground that these witnesses have been called by the government itself, and the government is in no better position to impeach their own witnesses than any plaintiff or party in any civil suit, and this impeaching of the witness by the government is contrary to all the known rules of procedure on the question of impeachment, and we respectfully ask, in view of all the facts, to withdraw a juror.

"The Court: To what?

"Mr. Sparks: To withdraw a juror.

"The Court: Well, the motion is denied.

"Mr. Sparks: I take an exception.

"The Court: And in denying the motion the court desires to say that this is not an extraordinary procedure in the least. Nothing has been done to violate the rules as to impeachment of witnesses. The court has a right to express its opinion in the circumstances of the present situation. If the court fails to do so, it would not do its duty. The court has even a right to express its opinion as to the way the verdict should go in a case in this court. I never exercised that right, and if the course suggested by counsel for the defendants was the proper course to pursue, then in any trial the government could be defeated, or in civil suit a plaintiff or defendant might be defeated in his case or in his defense, because a witness comes in and says 'I do not remember,' would be unable to proceed and complete the trial of any case. That would be giving a witness or witnesses the power to stop all proceedings in court. And as is said in this motion, gentlemen, as to prejudicing you against the defendants, there is no evidence in the case that any of these defendants are responsible for this witness' testimony. There is no evidence in the case to justify you in drawing the inference that any of these defendants are responsible for the attitude taken by the witness, so you should not draw any inference against the defendants. The young man on the stand is a witness called by the government. Whatever their relations may be, as appears by the testimony, would not warrant the court or the jury in charging this up, so to speak, to the defendants, or any of them; so you should be very careful not to let the conduct and the testimony of the witness in the respect indicated work any harm against any of the defendants. Now, before we take our recess, Judge Ocland, I wish you would ask him how long they have had their desks in the same room. I understood him to say one time more than a year and a half.

"Mr. Oeland: That is the way I understood him.

"The Court: I understood him another time to say a year and a half.

"Mr. Sparks: Nothing in the court's remark in reference to my motion can be deemed by me to have cured the situation which I assume to exist.

"The Court: Not in the least. The motion is denied, and what the court said is in explanation of the ruling that it made in denying the motion.

"By Mr. Oeland: Q. How long have you been within 10 feet—your desk being within 10 feet of Mr. MacMillan? A. About a year and a half.

"The Court: How long has your desk been in the same room with Mr. MacMillan?

"The Witness: About a year and a half.

"The Court: Before this year and a half, did you occupy different rooms or workshops?

"The Witness: He was not there; he had no desk.

"The Court: What kind of a desk do you work at, whether roll top or flat top?

"The Witness: Roll top.

"The Court: And what kind of a desk does Mr. MacMillan work at, whether roll top or flat top.

"The Witness: Roll top when he is there.

"The Court. I did not ask you when he was there. Are there any other desks in this room?

"The Witness: Yes, sir; about 30.

"The Court: About 30 desks?

"The Witness: Yes, sir.  *  *  *

"The Court: Well, you have been away attending these meetings and conventions; have you dined with him?

"The Witness: On some occasions.

"The Court: In a dining car?

"The Witness: No; I do not think we have been in a dining car together.

"The Court: In hotels?

"The Witness: I think we have been in a hotel together, but not in the same room.

"The Court: Never dined with him in a hotel on the European plan, in a restaurant where you make out—or a railway dining car where you make out—a schedule of the things to be served. Did you see him write?

"The Witness: I think not.

"The Court: Does he carry a little pocket memorandum book?

"The Witness: I could not say.

"The Court: Did you ever see him write in that?

"The Witness: I do not know that he carries one.

"The Court: You cannot tell about that?

"The Witness: No, sir.

"The Court: Tell the court whether you care to take any further time on this matter, do you?

"The Witness: My time is your time.

"The Court: I suggest that you might confer with counsel.

"The Witness: No, sir; my answers will be exactly as they have been.

"The Court: Very well. You are adjudged to be in contempt of this court and you are ordered to be committed to jail forthwith. Mr. Clark, you prepare the commitments. You are in the custody of the marshal from now on. And you may call the next witness."

Subsequently the court said:

"The Court: Well, gentlemen of the jury, I should say the action of the court in this regard should not be considered by you. You should draw no inference against these defendants, because there is no evidence in the case warranting it at the present time, and you will give attention, Mr. Reporter, to transcribing this testimony, in order that it may be used this afternoon. We will stop here for about 10 minutes in order that we may obtain another reporter.

"Mr. Sparks: Will your honor have an exception noted for all of these defendants?

"The Court: Certainly.. All of these defendants, so far as they are entitled to an exception to this proceeding against the witness, and not against the defendant."

June 11, 1918, the witness was committed for contempt, and remained in prison until April 14, 1919, when he was discharged by the United States Supreme Court upon a writ of habeas corpus on the ground that his testimony, even if false, did not obstruct the court in the performance of its judicial duties. In re Hudgings, April 14, 1919. Mr. Justice White said:

"Testing the power to make the commitment which is under consideration in this case by the principles thus stated, we are of opinion that the commitment was void for excess of power—a conclusion irresistibly following from the fact that the punishment was imposed for the supposed perjury alone, without reference to any circumstance or condition giving to it an obstructive effect. Indeed, when the provision of the commitment directing that the punishment should continue to be enforced until the contempt—that is, the perjury—was purged, the impression necessarily arises that it was assumed that the power existed to hold the witness in confinement under the punish-

ment until he consented to give a character of testimony which in the opinion of the court would not be perjured.

"In view of the nature of the case, of the relation which the question which it involves bears generally to the power and duty of courts in the performance of their functions, of the dangerous effect on the liberty of the citizen when called upon as a witness in a court which might result if the erroneous doctrine upon which the order under review was based were not promptly corrected, we are of opinion that the case is an exception to the general rules of procedure to which we have at the outset referred, and therefore that our duty exacts that we finally dispose of the questions in the proceeding for habeas corpus which is before us. It is therefore ordered that the petitioner be discharged."

We think that the attitude of the court in regard to the testimony of these three witnesses and the action it took in the presence of the jury in the case of the witness William F. Hudgings was most prejudicial to the defendants. It was very likely to intimidate witnesses subsequently called, to prejudice the jurors against the defendants, and to make them think that the court was satisfied of the defendants' guilt. What a judge may say to the contrary on such an occasion will not necessarily prevent such consequences. It is not enough to justify a conviction that the defendant be guilty. He has a right to be tried in accordance with the rules of law. The defendants in this case did not have the temperate and impartial trial to which they were entitled, and for that reason the judgment is reversed.

MANTON, Circuit Judge. I dissent. As stated in the prevailing opinion, the plaintiffs in error (hereinafter called the defendants) were officers or employés of the Watch Tower Bible & Tract Society, the People's Pulpit Association, and the International Bible Students' Association, corporations under which, it is alleged, they were engaged in following a religious belief. While our country was at war, and before the armistice was signed, the defendants were tried and convicted on an indictment containing the four following counts:

First Count. A conspiracy to cause insubordination, etc., in the military and naval forces of the United States.

Second Count. A conspiracy to obstruct the recruiting and enlistment service of the United States.

Third Count. An attempt to cause insubordination, etc., in the military and naval forces of the United States.

Fourth Count. Obstructing the recruiting and enlistment service of the United States, etc.

The offenses charged were committed between June 16, 1917, and May 6, 1918. The corporations, acting through their officers and employés, who were indicted, between June 30, 1917, and March, 1918, caused to be published 850,000 copies of a book called "The Finished Mystery." These copies were distributed in large numbers in the army camps of the United States, and many hundreds of thousands of copies were distributed throughout the United States and Canada. The book purported to be an interpretation of the Book of Revelations and the Book of Ezekiel. The book has taken the shape of a small bible or prayer book. The first half is devoted to many quotations, with interpretations, from the Scriptures. Then, in about the center of the book,

are found writings, placed there in a very insinuative manner, of which the following extracts are a type:

"Standing opposite to those Satan has placed three great untruths, human immorality, the Antichrist and a certain delusion which is best described by the word Patriotism, but which is in reality murder, the spirit of the very Devil. * * * Under the guise of Patriotism the civil governments of earth demand of peace-loving men the sacrifice of themselves and their loved ones and the butchery of their fellows, and hail it as a duty demanded by the laws of heaven." Page 247.

"If you say that this war is a last resort in a situation which every other method, patiently tried, has failed to meet, I must answer that this is not true—that other ways and means of action, tried by experience and justified by success, have been laid before the administration and willfully rejected.

"'In its ultimate causes, this war is the natural product of our unchristian civilization.' * * * There is not a question raised, an issue involved, a cause at stake, which is worth the life of one blue-jacket on the sea, or one khaki-coat in the trenches." Page 251.

At about this stage, the fertile mind of the reader would be very much interested, if sanctimonious at all. At this stage, he is supplied this food of poison for his patriotism and loyalty to his country. Under the mockery of religion or religious teaching, I can conceive of no worse thrust at America and at America's needs, at the time of the publication of this book, than that which was published in this book by the defendants. We in America all accord to men of all religious faiths the right to an honest and faithful belief in their creed and the practice of it accordingly, but that the defendants' efforts were intentional and for the desired purpose is apparent from a mere recital of some of the happenings during this period.

The defendant Rutherford wrote on July 17, 1917, referring to The Finished Mystery:

"It seemed good to the Lord to have the seventh volume prepared. * * * When the time came for publishing this work we were in the midst of much opposition, and knowing that to consult the opposers would hinder the publishing of the volume, I took counsel with Brothers Van Amburgh, MacMillan, Martin, and Hudgings of the office force."

The book was paid for out of the funds of the corporation with which the defendants were associated and which they managed. The effect of the book upon the drafted men is exemplified by some of these circumstances. As instances:

One Dutchess, formerly a National Guardsman, sold a copy of the book to one Sisson of Binghamton, N. Y. The latter claimed exemption later before the local board as a conscientious objector and was aided in this by the defendant Van Amburgh.

One Insberg was drafted and sent to Camp Devens in October, 1917. After purchasing the book, he refused to perform any military duty. He later bought a dozen volumes of the book and put them in the library of the Young Men's Christian Association at Camp Devens. Later he deserted.

One De Cecca was drafted, sent to Camp Devens, took a copy of the book with him, and then refused to work in camp.

One Niciti was drafted, sent to Camp Devens, got 30 copies of the

book, distributed them in camp. After he put on his uniform, he took it off and refused to do any work in camp.

One Anderson was drafted and sent to Camp Upton. After reading the book, he deserted, came to the Tabernacle (defendants' establishment), and while there an army officer was looking for him. He saw the officer; used the fire escape as a means of escaping from the building.

The record is replete with evidence indicating the defendants' active advising men subject to the draft to claim their exemption and to refuse to perform any duty in camp if they were drafted.

A pamphlet was later published, called the Bible Students' Monthly, and this by the Watch Tower Bible & Tract Society. An article therein was as follows:

"Young man, the lowest aim of your life is to be a good soldier. A good soldier never tries to distinguish right from wrong. * * * A good soldier is a blind, heartless, soulless, murderous machine. He is not a man; he is not even a brute, for brutes only kill in self-defense. * * * No man can fall lower than a soldier. It is a depth beneath which we cannot go."

Ten thousand copies of this monthly containing this quotation were reprinted in October, 1917, and paid for by defendants in the name of the Watch Tower Bible & Tract Society.

The guilt of the defendants is plain, and I do not understand that the majority of the court are of the opinion that the facts did not warrant this conclusion of the jury.

But this judgment is to be reversed because of the alleged adverse attitude of the court in regard to the testimony of three witnesses, Mrs. Mabel Campbell, Mrs. Agnes Hudgings, and William F. Hudgings, and the action taken by the court in the presence of the jury in the case of the witness Hudgings in committing him for contempt of court, saying it was so prejudicial to the defendants that it could not be cured by the many words of caution expressed by the trial judge.

In order to establish its case, the government found it necessary to call as witnesses employés and others who were attached to and associated with the defendant corporations. Mrs. Mabel Campbell was a stenographer for the defendants. She had written letters, carbon copies of which were taken from the defendants by a search warrant. She identified initials on the letters, and was placed on the witness stand to identify the letters. She refused to identify the letters. The court was apparently of the opinion that she was not telling the truth, and from the recital of what took place, as this record discloses, the court was undoubtedly correct in this conclusion.

Agnes Hudgings, also a stenographer, wrote certain letters to which she attached initials which she used in her course of business conduct in writing such letters; letters indicating the initials of the person who dictated the letter. She was the wife of one of the officers of the association. She refused to identify the letters, and the court, having reached the conclusion that she was not telling the truth, did not hesitate to tell her that she was evading and fencing, and not frank and truthful. Whatever was said by the court in his questions was at once

258 F.—55

followed by directing the jury not to permit it to prejudice any one; that it should not reflect against the defendants or the government, for nothing appeared, he said, indicating that the defendants or the defendants' counsel were responsible for the attitude taken by the witnesses, the two stenographers.

Hudgings was called as a witness to identify the handwriting of one of the defendants, MacMillan. He was in close association in the same office, sitting within 10 feet of the desk occupied by MacMillan for two years, and declared that he could not identify the handwriting of either MacMillan or Van Amburgh.

At this stage of the trial, the conduct of the witnesses who were called, and who were associated with the defendants, became so palpable that the court properly told the witness he was not telling the truth. He ordered him committed for contempt of court. At once the court instructed the jury:

"There is no evidence in the case to justify you in drawing the inference that any of the defendants are responsible for the attitude taken by the witness, so that you should not draw any inference against the defendants."

The right to commit for contempt of court, or to summarily cause the arrest of a witness for perjury, is well recognized and approved by our courts. Of course, there must be facts justifying the contempt proceedings. This rule was recently laid down in Re Hudgings, 249 U. S. 378, 39 Sup. Ct. 337, 63 L. Ed. 656, decided April 14, 1919, by the Supreme Court of the United States. In this recent decision of the Supreme Court, the power to commit for contempt, when the circumstances warranted it, was recognized; but it was held that in the particular instance of Hudgings the circumstances did not warrant his commitment.

Throughout the trial, the court constantly protected the defendants' rights by frequent caution, and in many instances he asked the jury not to be prejudiced because of occurrences which took place during the course of the trial, which the court felt might in some way prejudice the defendants. And again, in the charge to the jury, the court left with the jury the statement that he had no opinion as to the facts, and that the facts were for the jury solely, and that no unfavorable inferences should be drawn by reason of any statement made by the court, nor should they be influenced by anything that occurred during the course of the trial. The rule has long been established that the trial judge of the District Court has wide latitude in the conduct of a trial; he may even comment upon the weight of evidence; so, too, he may comment upon the conduct of the witnesses and of counsel. Simmons v. United States, 142 U. S. 148, 12 Sup. Ct. 171, 35 L. Ed. 968; Vicksburgh, etc., Co. v. Putnam, 118 U. S. 545, 7 Sup. Ct. 118, 30 L. Ed. 299; Lovejoy v. United States, 128 U. S. 171, 9 Sup. Ct. 57, 32 L. Ed. 389; Breese v. United States, 106 Fed. 680, 45 C. C. A. 535; Smith v. United States, 157 Fed. 721, 85 C. C. A. 353.

Indeed, it is my opinion that the learned District Judge was most patient and considerate of the defendants' rights. His consideration of defendants' counsel, who in their zeal to protect their clients' interest

many times overstepped the bounds of due respect to the dignity of the court, was magnanimous and kindly.

I see no error warranting a reversal of this conviction in the conduct of the trial judge, and in my opinion the judgment should be affirmed.