## CONNLEY et al. v. UNITED STATES.
## No. 6124.

Circuit Court of Appeals, Ninth Circuit.
Jan. 5, 1931.

See also 41 F.(2d) 49.

Mark L. Herron, C. L. Belt, and Russell Graham, all of Los Angeles, Cal., for appellants.

Samuel W. McNabb, U. S. Atty., and J. Geo. Ohannesian and William R. Gallagher, Asst. U. S. Attys., all of Los Angeles, Cal.

Before RUDKIN and WILBUR, Circuit Judges, and NORCROSS, District Judge.

NORCROSS, District Judge.

Appellants, Peter Connley and Herman F. Quirin, together with Nick Bruno and Joe Verda, were made defendants in an indictment charging offenses in six counts, briefly stated in substance as follows:

1. A conspiracy to unlawfully manufacture, possess, and transport intoxicating liquor.

2. The unlawful manufacture of intoxicating liquor.

3. The unlawful possession of a still not registered with the collector of internal revenue.

4. The unlawful carrying on of the business of distillers without having given bond and with intent to defraud the United States of revenue.

5. The unlawful making and fermenting of about 50,000 gallons of mash on certain premises other than a distillery authorized by law.

6. The unlawful possession of about 1,300 gallons of intoxicating liquor for beverage purposes.

Upon trial appellant Connley was convicted upon all counts. Appellant Quirin was convicted on count one. Defendants Bruno and Verda were acquitted.

Sentences of imprisonment were imposed upon appellant Connley of one year and two months on the first count, two years on the second count, one year and two months on the third count, and one year and one month on each of counts four and five, the sentences to run consecutively. In addition, Connley was fined $4,000, inclusive of the maximum fine of $500 on count 6. Appellant Quirin received an imprisonment sentence of 21 months and a fine of $1,000. From the judgments entered appeal is taken.

On behalf of appellant Connley, it is contended that the third count of the indictment does not state an offense, in that it does not charge a failure to register with the Prohibition Administrator, as required by article 18 of Prohibition Regulation 3, adopted in pursuance of the Prohibition "Reorganization Act" (5 USCA § 281c).

■ In the case of Silva v. United States, 35 F.(2d) 598, this court held "the defect is vital." In the Silva Case the question had been raised by motion in arrest of judgment, while in this case the question is presented for the first time on appeal. For that reason it is contended by appellee that appellant may not now be heard to question the sufficiency of the count, citing United States v. Dibella (C. C. A.) 28 F.(2d) 805. It would seem that in the Dibella Case the court treated the indictment as then presenting simply a question of a defective statement of an offense, rather than an entire failure to charge a crime, as was later held by the same court in United States v. Lecato, 29 F.(2d) 694. The rule, however, applied by this court is that where "the indictment fails to state facts sufficient to constitute the crime charged," the question may be raised for the

first time on appeal. Sonnenberg v. United States (C. C. A.) 264 F. 327, 328. See, also, Remus v. United States (C. C. A. Sixth Circuit) 291 F. 513, certiorari denied 263 U. S. 717, 44 S. Ct. 180, 68 L. Ed. 522.

Further on behalf of appellant Connley, it is contended:

"The offenses charged and attempted to be charged in the second, third, fifth and sixth counts of the indictment are component parts of and necessarily included in the offense charged in the fourth count of the indictment, and sentences on each of said second, third, fourth and sixth counts, to run consecutively, constitute double jeopardy and result in five different punishments for the one inclusive offense."

The only question raised in the trial court respecting two or more offenses charged in the several counts of the indictment being in fact but one offense was presented upon a motion requiring the government to elect whether it would proceed on the second or the fifth count, which motion was denied. The ruling upon this motion is not assigned as error. Whether any count of the indictment is inclusive of an offense charged in another count, or whether such question may be considered when raised for the first time upon appeal or in the absence of assignment of error, is unnecessary to determine.

■ It is contended that the trial court was guilty of misconduct prejudicial to the rights of appellants in its examination of the witness Richard Kelly.

Richard Kelly, a proprietor of certain boiler works in the city of Los Angeles, was called as a government witness to testify to the sale of certain boilers and other merchandise which constituted part of the equipment of a still located on the ranch of defendant Bruno, at which still the defendant Connley was arrested on January 21, 1930. The several items so sold were carried into the books of account of the witness Kelly as having been sold to one P. Walker. The witness described Walker "as a man about thirty years old and weighing two hundred pounds or over." The witness did not identify Walker as the defendant Connley, nor does the record show that upon his original examination he was asked if he could identify him. During the examination of the witness Albert Kruse, an employee of Kelly, the court stated: "I don't see why this court shouldn't order this man Kelly in here again." The jury was excused and Kelly appeared before the court. Among a number of expressions the court

said to Kelly: "Now developments this morning convince the court * * * that you are, to say the least, able to identify the man Walker, known to you as Walker, * * * and we expect you to get your memory in shape to identify that man if he is in the court room." Kelly was directed to walk around within the railing of the courtroom past where the defendants were sitting, and was then asked: "Do you see anybody inside of the railing that, in your judgment, appears like the man who had these several business transactions with you?" To which question Kelly replied: "Well, I wouldn't say that I could identify any of them, your Honor." Following this answer the court stated: "The court is of the opinion that this witness is bound not to be frank * * * and he is bound to come through, if it is possible." After further directions to "look at each individual and see if you can see the man with whom you had this transaction, or a man that looks like him," the witness answered: "I wouldn't say that there was anybody there that I could say for sure." Later, in reference to the defendant Connley, Kelly said: "Well, I would say he looks more like him than any one else I see down there." To the court's question, "Well, does he look like him," Kelly answered: "Well, in a general way, yes."

The jury was returned to the courtroom, and after counsel for the prosecution stated, "We have no questions to ask this witness," the court said: "The court will accept that responsibility, gentlemen, with pleasure, as a matter of necessity." Following certain preliminary questions or statements the court said to the witness: "Tell the jury whether you see in the court room a man who resembles this P. Walker with whom you had these transactions." The reply of the witness, and other portions of the record relating thereto, are as follows:

"I am telling the jury I looked at the people around the court room and I only see one that I would say resembled this man that went by the name of Mr. Walker. I wouldn't say that was him for sure, but—

"The Court: Which man is it?

"The Witness: This man sitting over there with the red necktie. * * *

"The Court: Let the record show the defendant indicates the defendant Connley alias Walker. Cross examine.

"Mr. Belt: No cross examination."

Upon the conclusion of this testimony a recess was taken, following which, the court,

out of the hearing of the jury, directed the marshal to detain Mr. Kelly in his custody.

While the witness Albert Kruse was on the stand, and before the jury was directed to retire from the courtroom, he had testified: "The person that came there was a heavy, fleshy man. I don't know his age, if I am not mistaken, I would suggest he would be about 30, maybe 35, something like that."

After the jury had retired, the court said: "I was very well satisfied that Mr. Kelly was determined the other day not to make a witness in this case if he could help it." And further: "When it comes to the question of identification, certainly Kelly ought to be able to help, better than this man." And to the witness Kruse said: "Would you know the man you saw talking with Kelly again, if you saw him?" The reply of the witness was: "Well, I probably would, although there is lots of people coming in there and the chances are I may and the chances are I may not." After the jury returned the witness Kruse testified: "I have seen the gentleman I have described * * * two or three times. * * * I didn't pay any particular attention. From the witness stand it appears to me that this man between the two gentlemen in gray (indicating the defendant Connley)."

Charles Kruse, also an employee of Kelly, following the second examination of the witness Kelly, testified: "I was working at Kelly's Boiler Works in the month of January of this year. I saw two men there that I see here. In connection with my statement that I see one man, it is the gentleman sitting next to the lady with the brown straw hat, * * * the one with his hand to his mouth (indicating the defendant known as Connley). I saw the defendant Connley more than once. I would say I saw him at least twice, because I saw him in two different places. * * * The other gentleman was the young man sitting to the left of the lady (indicating the defendant Bruno), the one with the small moustache there." Upon cross-examination the witness testified: "I was sitting here in the court room during the time Mr. Kelly testified. This man, Mr. Bruno, was not pointed out to me by anyone in the court room."

It is the contention of counsel for the appellants that the character of the examination of the witness Kelly made by the court had the effect not only of intimidating Kelly but Kelly's employees who were later called to testify. It is contended that this is particularly true in the case of the witness Charles Kruse, who not only identified the defendant

Connley but also the defendant Bruno as being among those who came to the Kelly Boiler Works to purchase material used in the construction of the still. Counsel call attention to other testimony in the case to the effect that defendant Bruno was not in the city of Los Angeles at the time the witness testified to seeing him at the Kelly Boiler Works.

The question presented upon this phase of the case is similar to that presented to the Circuit Court of Appeals, Second Circuit, in Rutherford v. United States, 258 F. 855, 863. From the opinion in that case we quote:

"We think that the attitude of the court in regard to the testimony of these three witnesses and the action it took in the presence of the jury in the case of the witness William F. Hudgings was most prejudicial to the defendants. It was very likely to intimidate witnesses subsequently called, to prejudice the jurors against the defendants, and to make them think that the court was satisfied of the defendants' guilt. What a judge may say to the contrary on such an occasion will not necessarily prevent such consequences. It is not enough to justify a conviction that the defendant be guilty. He has a right to be tried in accordance with the rules of law. The defendants in this case did not have the temperate and impartial trial to which they were entitled, and for that reason the judgment is reversed."

See, also, Adler v. United States (C. C. A.) 182 F. 464; Glover v. United States (C. C. A.) 147 F. 426, 8 Ann. Cas. 1184; People v. Mahoney, 201 Cal. 618, 258 P. 607.

On behalf of appellant Quirin error is urged in denying a motion for a directed verdict of not guilty made upon conclusion of the Government's testimony and renewed after both parties had rested. Denial of the motion presents the question of the legal sufficiency of the evidence to support the verdict. At the outset we are confronted with the anomalous situation of a verdict of guilty on the count for conspiracy and of not guilty on all other counts. This is a case where the unlawful objects of the conspiracy were accomplished at least in part. To acquit of all offenses charged and embraced in the purpose of the conspiracy presents a case of inconsistent verdicts. If a conspirator, necessarily Quirin legally would also be guilty of one or more of the remaining counts charged in the indictment.

The evidence against Quirin establishes that he lived in a house on premises owned by him adjoining the Bruno ranch. The Quirin house was on the main Perris-Elsinore highway. Near the house on the Quirin property was an incline shaft sunk at some time for prospecting or mining purposes. The bottom of the shaft was below water level. A pump had been set up in the shaft for the purpose of pumping water through a pipe line which led to a reservoir near the Bruno house. From the reservoir another pipe below ground connected with a small tank in the still pit. This was apparently the source of water supply for the still. There is no testimony to the effect that Quirin knew of the connection by pipe line between the reservoir and the still. Use of the abandoned mine shaft as a water supply for domestic or irrigation purposes on the Bruno ranch would not of itself be a circumstance inconsistent with innocence.

In July, 1929, Bruno, in company with Quirin, rented a team from one Amsbow, a neighbor, and later Quirin paid Amsbow for the use of this team. Amsbow testified: "I knew Nick Bruno * * * when he rented my team. * * * He said he would stand good for the team. He, Mr. Bruno, told me he was going to do some excavating * * * to level some dirt, I think move it. * * * He (Quirin) stated that he was going to use the team for excavating purposes." Even if it be assumed, although it does not so appear from the testimony, that the team was used in making the excavation which subsequently became the still pit, it would not follow from that fact alone that Quirin knew or would have any reason to know that a still was to be subsequently erected within the excavation.

Between August, 1929, and January 21, 1930, Quirin bought various consignments of lumber from the Dill Lumber Company. Such of the consignments as were delivered by the Dill Company were delivered to the Quirin house, upon which he had constructed certain additions and made certain improvements. Upon the only material question respecting these lumber sales—whether any portion of the lumber went into the construction of the framework of the still—the manager of the company testified: "I would say that 95 per cent. of the lumber in the framework of the pit is lumber that we did not sell to Mr. Quirin. The other 5 per cent. * * * might have been part, * * * but I cannot say that it is."

On January 21, 1930, the day of the raid on the still, Quirin, in company with Connley, obtained from the Dill Lumber Company twenty-eight pieces of lumber in three sizes, and some nails. The purchase was charged

to Quirin. The lumber was taken to the Bruno ranch and unloaded "in the field down below the house," apparently not in the immediate vicinity of the still. What this lumber was to be used for is only a matter of conjecture. At the time of his arrest Connley told the officers he was a contractor and was going to build a tank.

A witness testified that he met Quirin in July or August, 1929, at a point about three-quarters of a mile from the Bruno house, from which point witness could see a pile of dirt near Bruno's house. To an inquiry of the witness Quirin said: "they were building a cheese factory down there." This statement, witness testified, "seemed to me to be intended seriously." In connection with this circumstance counsel for appellant, while contending that it is not incriminating, calls attention to testimony to the effect that Bruno was the owner of about a thousand goats and urges that cheese may be made from goats' milk.

At the time the officers raided the still there were some three or four other persons at different places on the Bruno ranch who left about the time of the arrest of Connley. One drove a truck which he left at the rear of the Quirin house. Later one of the officers, who had taken the number of the truck, went to the Quirin house and found no one there. He took the "rotary off the distributor so that they couldn't use it." Later in the day the officers returned to the Quirin premises. They found Quirin inside his house shaving. The truck was gone. When agent Clements walked into Quirin's house, the latter said: "What do you mean by coming in here?" The agent replied: "I have come over after you." Quirin then said: "What are you going to do—take me over and set me on the spot?" Quirin was asked what became of the truck and replied: "Well, the man who owned the truck took the truck away * * * I don't know him by name but I know him when I see him." A distillate drum with similar markings to a number of drums found on the Bruno ranch was found at the Quirin home.

A. G. Barber, chief of police of Elsinore, testified he had seen Quirin four or five times with Connley and more than once with Bruno; that he had seen the three of them together at different times by the Quirin property as he was going along the highway.

The case against Quirin rests upon a number of circumstances which taken singly or collectively are not inconsistent with innocence. Sugarman v. United States (C. C. A.) 35 F.(2d) 663; Ferris v. United States (C. C. A.) 40 F.(2d) 837; Haning v. United States (C. C. A.) 21 F.(2d) 508. What evidently was regarded as the strongest circumstance of guilt was that respecting the pump in the old mine shaft and the water pipe leading to the Bruno property. Concerning this circumstance the court instructed the jury:

"You are justified in assuming that the pipeline from the Quirin mine to the well or to the still was an essential factor of this unlawful operation. You have seen how obvious that was in its close association to the Quirin residence, and, in the absence of anything to qualify the force and effect of that testimony, you are justified, if you conclude to do so, in assuming that Quirin permitted his premises to be used in this enterprise, at least to that extent and if he did that consciously, knowing that he was making thereby a contribution to this unlawful act, he associated himself with it as fully as if he were there all the time actively at work underground, and this is independent of the other testimony which has been argued to you, coming from the government, of his association with the man Connley—otherwise Walker—and Bruno at various times."

To this instruction exception was taken upon the ground that in effect it advised "that the jury would be warranted in believing that Quirin permitted water knowingly to be taken from his reservoir for use in the still." Following this exception the court further instructed the jury:

"The court means by that—and if I didn't make it plain, I will do so now—that in view of all circumstances the construction there at the mine, especially in proximity to Quirin's residence, the character of the pipe and the direction which it took, the ownership of the property by Quirin and the incidents that would normally accompany the pumping of water in that shaft to go through that pipe, those things unexplained would warrant the jury in concluding that Quirin consented consciously, knowingly and willingly to the use of his premises to that extent to aid this unlawful enterprise. When we say that we do not mean that should be your conclusion, because that is your business, not the court's. I am only telling you if you base upon those incidents a conclusion that Quirin was a party to the conspiracy, it would stand in law. That is all."

The court's instructions wholly failed to take into consideration the important element that the pipe line from the shaft did not directly connect with the still but with a reser-

voir, from which another pipe line supplied water from the reservoir to the still; the still and pipe line supplying it both being concealed. Because of this important omission the instructions were erroneous and in themselves prejudicial.

Judgments reversed, and cause remanded for new trial.