El Pueblo de Puerto Rico, demandante y apelado, *v.* Jesús León Martínez, acusado y apelante.

Núm. 6973.—*Sometido:* Junio 17, 1938. *Resuelto:* Julio 6, 1938.

*Leopoldo Tormes García,* abogado del apelante; *R. A. Gómez, Fiscal,*
y *Luis Janer, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

El fiscal de la Corte de Distrito de Ponce formuló acusación contra Jesús León Martínez por un supuesto delito de homicidio voluntario consistente en haber dado muerte ilegal a Jenara Cruz Vélez en ocasión de una súbita pendencia, haciéndole tres disparos de revólver que le produjeron dos heridas a consecuencia de las cuales falleció poco después de recibirlas.

El acusado hizo alegación de inocente y solicitó juicio por jurado. Celebrado el juicio, el jurado rindió un veredicto declarándole culpable de homicidio voluntario y la corte lo sentenció a cumplir un año de presidio con trabajos forzados.

Resulta de la evidencia tanto de El Pueblo como de la defensa que la interfecta y el acusado habían vivido en concubinato por espacio de varios años; que la interfecta era una mujer díscola, pendenciera y adicta al licor, mientras el acusado era un hombre sin antecedentes penales, honrado, laborioso, y que a pesar de faltarle una pierna, siempre había vivido de su trabajo; que cuatro o cinco meses antes de la muerte de Jenara, el acusado y ella se habían separado, lo cual no obstaba para que Jenara, impulsada por la pasión de los celos, fuese frecuentemente al ventorrillo de Jesús a provocarlo, amenazándolo con privarle de la vida; que el día de autos, el 9 de diciembre de 1934, como a las ocho de la noche, en momentos en que el acusado se disponía a cerrar su pequeño establecimiento, llegó allí la interfecta en actitud colérica, injuriándolo y amenazándolo con cortarle

el cuello, y tomando una pesa de cuatro libras que se hallaba sobre el mostrador, lo agredió con ella causándole una herida en la frente que lo bañó en sangre. Fué en ese momento que el acusado, temeroso de la interfecta por su carácter y antecedentes que conocía, cogió el revólver que guardaba en la gaveta del diario y le hizo los disparos fatales.

Refiriéndose al momento de los disparos, declaró el acusado:

"Al momento que me dió, que yo estoy entre medio del mostrador y el aparador . . . y cuando me dió, me levanté y entonces tiré la mano así y encontré el revólver y le hice tres disparos, que no se los hice intencional, sino en estado de demencia, porque el golpe era grande, la hemorragia era terrible, y al hacerle los tres disparos, se apagó el quinqué . . . ." (Trans., pág. 122.)

Al preguntarle su abogado cuántas veces Jenara lo había amenazado de muerte, contestó:

"Eso era un sinnúmero, cuando le venía en ganas a ella. Porque era una mujer terrible de genio. Ella no era mala, pero era terrible de genio. En el treinta y cuatro se fajó con un hombre, macho a macho." (Trans., pág. 124.)

Más adelante, describiendo su estado de ánimo al recibir la agresión, declaró:

"P. Usted dice que cuando usted recibió el golpe ese con la pesa, le dió una 'grima' terrible?

"R. Sí, señor.

"P. ¿Qué quiere usted decir con 'grima' terrible?

"R. Que me podía matar.

"P. ¿Que le dió a usted temor?

"R. Temor.

". . . . . . .

"P. Sí, a la vez que le dió el golpe ese, ¿qué decía?

"R. No decía nada.

"P. ¿No decía nada en ese momento?

"R. Cuando me provocaba sí. Desde luego, dejó de provocarme para darme. Desde luego, antes de darme me provocaba, pero después me dió, y fué que yo le hice los disparos.

"P. ¿Y entonces fué que usted tuvo esa 'grima' que dice usted?

"R. Que yo sabía que ella me mataba.

"...

"P. Dígame, don Jesús, ¿usted dice que es un hombre inválido?

"R. Sí, señor.

"P. Al decir que es un hombre inválido, ¿qué quiso usted decir?

"R. Pues un hombre que yo cuento que no puedo afrontar ninguna situación porque yo estoy aquí—a un suponer—sentado, si me paro, pues las dos piernas no pueden trabajar, una con la otra. . . .

"...

"P. ¿Usted no puede andar sin las muletas?

"R. No, señor. Yo me dedico al negocito ese que tengo y desde luego, me paro, y si no tengo las muletas, tengo que estar agarrado. Yo me llamo un hombre a la hora de ésta, inválido, porque no me puedo comparar con un hombre que tiene sus cuatro piezas, así es que no puedo afrontar ninguna situación ni ahora que estoy inválido ni antes porque siempre he sido una persona digna, ajena de pendencias." (Trans., págs. 133 y 134.)

A repreguntas del fiscal, contestó el acusado:

"P. ¿Después que ella le dió?

"R. Sí, después que ella me dió le tiré.

"P. ¿De venganza, de coraje, de cólera?

"R. Sí, seguro. (Trans. pág. 128.)

"P. ¿Y cuando usted vió a esa señora frente a usted, a usted no le dió remordimiento?

"R. Lo que me dió fué una 'grima' terrible.

"P. Perdóneme. . . . ¿A usted no le dió remordimiento el hacerle tres disparos a ella?

"R. Porque como no se los hice en estado normal, sino con el golpe ése, lleno de rabia. . . . (Trans., pág. 130.)

Del interrogatorio que precede fácil es concluir que el acusado estableció un caso prima facie de defensa propia para ser sometido a la consideración del jurado. El hecho de que él disparase lleno de rabia, sediento de venganza, si se quiere, como admitió contestando una pregunta sugestiva del fiscal en que dicho funcionario usaba tales palabras, no le priva de presentar a la consideración del jurado los hechos que a su juicio justificaban el homicidio por haber ac-

tuado en legítima defensa. No hemos de pretender que un hombre inválido que recibe una agresión en la frente como la que recibió, repela el ataque con una sonrisa en los labios. Era humano que estuviese lleno de rabia y sediento de venganza, condiciones éstas perfectamente compatibles con el razonable temor que en aquellos momentos pudiese tener de continuar recibiendo grave daño corporal o de perder la vida. Sus medios de defensa no eran iguales a los de un hombre en perfectas condiciones físicas. La mujer que lo agredió tampoco era una mujer cobarde e inofensiva.

Al solicitar la revocación de la sentencia alega el acusado que la corte *a quo* cometió cuatro errores, a saber:

"*Primero.*—La corte cometió error grave y perjudicial para el acusado al hacer comentarios ante el jurado no autorizados por ley alguna en ·esta Isla, tanto al comenzar el juicio como cuando transmitía al jurado las instrucciones.

"*Segundo.*—La corte cometió error grave y perjudicial para el acusado al transmitir al jurado la instrucción sobre legítima defensa que por escrito, y en tiempo y forma, el acusado había solicitado, y al comentar la corte que no conocía la aplicación de la jurisprudencia de California citada por el acusado, y que esta Hon. Corte había citado con aprobación en el caso de *El Pueblo* v. *Chico,* 45 D.P.R. 500.

"*Tercero.*—La corte inferior cometió error grave y perjudicial para el acusado al transmitir al jurado las instrucciones haciendo una relación incompleta y hasta desviada de lo declarado por los distintos testigos e induciendo con ello a una errónea apreciación de los hechos por parte del jurado.

"*Cuarto.*—El veredicto en este caso es contrario a las pruebas y a derecho."

██ Los dos primeros errores están tan íntimamente relacionados que a fin de evitar innecesarias repeticiones conviene discutirlos conjuntamente y así lo vamos a hacer.

Al comenzar el juicio, y mientras declaraba Asterio Torres, primer testigo del fiscal, se desarrolló el siguiente incidente entre el fiscal, la defensa y el juez:

"*Fiscal.*—¿Cuánto tiempo usted los conocía a los dos, a ellos, antes de ser cónyuges?

"Yo los conocí juntos a ellos en otro barrio más arriba de Santa Isabel, que yo no recuerdo el nombre de él.

"¿En qué año los conoció?

"No recuerdo.

"¿Cuánto tiempo los conoció juntos a ellos, cuántos años?

"Pues, más o menos, como un año y medio. . . .

"Dígame una cosa, cuando usted conoció a este acusado con Jenara Cruz Vélez como cónyuges, ¿él tenía las dos piernas, o una sola pierna?

"*Defensor:* Eso es inmaterial, señor juez.

"*Fiscal:* Es para particularizar ciertos hechos de la acusación.

"*Juez:* Se admite. El jurado está viendo al acusado, a quien le falta una pierna, y ese hecho puede impresionar a los señores del jurado; de manera que es bueno que sepan si este señor tenía sus dos piernas o no las tenía el día de los hechos.

"*Defensor:* Por las manifestaciones de la corte, por el comentario que hace. . . .

"*Juez:* La corte está dispuesta a comentar todo lo que crea que está dentro de ley y que cada uno cargue con su responsabilidad en los juicios por jurado ante la Corte de Distrito de Ponce: el Fiscal y el abogado defensor con la suya, el jurado con la de él y el juez con la que le corresponda.

"*Defensor:* Y el abogado defensor también. . . .

"*Juez:* Por eso, ya lo he dicho, 'el abogado defensor con la suya.' *Y que el Supremo resuelva en cuanto a esta situación en los casos de juicio por jurado.*

"*Defensor:* Y el abogado también está dispuesto a cargar con la suya; y por eso toma excepción, porque el que debe hacer cualquier comentario para defender sus puntos de vista en cuanto a las cuestiones que se levantan entre el fiscal y el acusado es el fiscal.

"Yo, por eso me opongo, porque si el acusado tiene una pierna menos, ese hecho no se está ventilando aquí ante los señores del jurado en este día; y el testigo lo que tiene que declarar son los hechos esenciales de la acusación, que son los que se exponen en ella y nunca ningún otro que pueda afectar al acusado en su condición física. Ese es el fundamento.

"*Juez:* Puede seguir el fiscal. . . ." (Trans., págs. 6 y 7.)

Si bien no debió haber sucedido este incidente, como acertadamente dice el fiscal de este tribunal, estamos de acuerdo con él en que no perjudicó los derechos sustanciales del acu-

sado. Más bien tendió a beneficiarlo. Del incidente resultó que con anterioridad a los hechos que se le imputan y que dieron lugar a la muerte de Jenara Cruz Vélez, el acusado había perdido una pierna. Esa circunstancia lo colocaba en mejores condiciones para alegar con éxito la defensa propia que si él hubiese estado en perfectas condiciones físicas. El hecho de que el juez, en el calor del incidente, mencionase al Tribunal Supremo, no pudo perjudicar los derechos del acusado, porque estando en el principio del juicio, declarando todavía el primer testigo del fiscal, el jurado no tenía motivos para creer que el juez hubiese formado ya la opinión de que ellos habrían de declararlo culpable y que consiguientemente el Tribunal Supremo habría de revisar la sentencia en apelación.

■ No existe, sin embargo, justificación alguna para las manifestaciones del juez al disponerse a transmitir la instrucción especial sobre defensa propia solicitada por el acusado. Dicha instrucción fué la siguiente:

"Una persona puede repeler la fuerza con la fuerza en la defensa de la persona, bienes o vida contra uno que abiertamente intenta o trata por medio de la violencia o de la sorpresa de cometer un determinado delito *misdemeanor* o *felony*, o cualquiera de ellos, o de causar un grave daño corporal a su persona, y el peligro que justificaría al acusado a cometer el acto imputádole, puede ser real o aparente; y el jurado no tiene que considerar si el acusado estaba en verdadero peligro de su vida o propiedad, sino solamente si las circunstancias eran tales que indujeran a una persona de mente sana a creer que su persona o sus bienes estaban expuestos a tal peligro; y si racionalmente podía así creerlo y tenía suficiente causa para estimarlo así, y cometió el hecho que se le imputa bajo tal creencia, aun cuando apareciera que el interfecto no estaba armado, ustedes deben absolverlo." (Instrucciones, pág. 8.)

Inmediatamente antes de transmitir esta instrucción al jurado, el juez se expresó en los siguientes términos:

"Yo he de daros a ustedes las instrucciones correspondientes a la defensa propia, pero, a petición de la defensa, he de daros éstas por escrito que me ha presentado, que es una jurisprudencia del Tri-

bunal Supremo, tomada de una decisión de California que se cita en un caso de nuestra Corte ·Suprema, sin citarse los hechos que el Tribunal de California tuvo ante sí para dar esa instrucción. En otras palabras, *no conocemos los hechos del caso de California;* por lo menos, de la cita que se hace del tomo 17 *no aparecen las circunstancias que tuvo ante sí el juez de la corte de California para dar esta instrucción;* pero nuestro Tribunal Supremo la cita con aprobación, y ahora a esta corte se le pide por la defensa que la misma sea transmitida al jurado en este caso, y esta corte la transmite, sin que este juez esté conforme con toda esa instrucción.'' (Itálicas nuestras.)   (Instrucciones, pág. 7.)

Inmediatamente después de transmitir la instrucción que ya hemos transcrito, continuó el juez expresándose en los siguientes términos:

''Pero os digo yo a ustedes, señores del jurado: para juzgar ustedes si este acusado actuó o no en defensa propia, tienen que ir a la prueba.   La prueba es la que tiene en todo caso el jurado que analizar, y después de analizarla, decir si les merece crédito la teoría que se establece, cualquiera que ella sea, y si ha sido justificada por la prueba.'' (Instrucciones, pág. 8.)

Al considerar la instrucción solicitada por la defensa, el juez sólo tenía ante sí estas tres alternativas: transmitirla íntegramente; modificarla si entendía que la misma no era del todo correcta o que las circunstancias del caso no justificaban la instrucción en la forma solicitada; o denegarla si estimaba que la instrucción no era correcta o no estaba justificada por la evidencia.   Pero es indudable que al transmitirla en la forma en que lo hizo, el juez de la corte inferior perjudicó grandemente los derechos sustanciales del acusado, pues de nada valía que transmitiese la instrucción si al así hacerlo empezaba por desacreditarla haciéndole saber al jurado que el propio juez no la aceptaba como correcta.   No era necesario que se estableciesen los hechos que tuvo por base la corte de California para sancionar aquella instrucción.   El principio primordialmente envuelto en ella es el de la doctrina de peligro aparente, universalmente aceptado, y

sancionado por los artículos 209, inciso 3, y 210 del Código Penal de Puerto Rico.

Instruir al jurado que para determinar si un acusado actuó o no en defensa propia tiene que ir a la prueba y que la prueba es la que tiene en todo caso el jurado que analizar, y después de analizarla decir si le merece entero crédito la teoría que se establece, dicho así escuetamente y sobre todo después de las manifestaciones que se hicieron antes de transmitir la instrucción solicitada por la defensa, equivalía a decirle al jurado que descartase por completo aquella instrucción que acababa de transmitírsele y aplicase su propio criterio. Es indudable que el jurado, para determinar si la defensa propia ha sido o no establecida, debe analizar la prueba, pero este análisis debe hacerse a la luz de la ley que le transmite el juez en sus instrucciones.

■■ Resulta más evidente el perjuicio causado al acusado con motivo de las instrucciones de la corte al considerar las siguientes manifestaciones del juez al jurado:

"La defensa propia está sujeta a ciertas reglas o requisitos; y el primero de ellos es el que se señala en el artículo 54 de nuestro Código Penal que dispone que el derecho a la propia defensa en ningún caso se extiende a la inflicción de más daño que el necesario al objeto. ¿Qué quiere decir esto, señores del jurado? Que si a uno le dan una bofetada, uno se puede defender de esa bofetada con otra bofetada, pero no infiriendo más daño que el que le infieren a uno. *En Puerto Rico se está tomando esto erróneamente y se ha llegado a creer que una bofetada se puede contestar con un tiro, para después venir a decir a la corte, 'le pegué un tiro en defensa propia.'* Estoy dando a ustedes instrucciones legales, basadas en lo que dispone nuestra ley sustantiva en Puerto Rico, el Código Penal, que, mientras no sea enmendado, es la ley en Puerto Rico en esta materia —y lo sabe mi distinguido compañero el licenciado Tormes, que es miembro de la Legislatura.

"En un caso de homicidio, señores del jurado, en que se alega la propia defensa, es necesario no sólo creer, sino tener motivos fundados para creer, que al matar al agresor se hallaba el agredido en inminente peligro de muerte o de grave daño personal. De manera que nuestra ley lo dice: no solamente es necesario creer, sino tener

motivos fundados para creer. *Y ésa es nuestra ley sustantiva, no es jurisprudencia de California que dice que después puede resultar que no hubo tal cosa o no resultó lo que uno creía y que así también queda justificada la defensa propia."* (Itálicas nuestras.) (Instrucciones, págs. 10 y 11.)

Esta instrucción es claramente errónea y no solamente desacredita la instrucción especial que a petición de la defensa transmitió la corte, si que también niega el principio del "peligro aparente" sancionado, como hemos visto, por nuestro Código Penal. La jurisprudencia toda, sin que conozcamos excepción alguna a la regla, admite, en relación con la defensa propia, que el acusado puede alegarla con éxito cuando tenga justificados motivos para creer que está en inminente peligro de perder la vida o de recibir grave daño corporal, aunque después resulte que en realidad de verdad el peligro no existió. En el presente caso el acusado tenía perfecto derecho a que el jurado, libre de prejuicios, tomase en consideración este principio al determinar si él había actuado o no en legítima defensa.

■ Al decirse en las instrucciones al jurado que *"es Puerto Rico se está tomando esto erróneamente* (se refiere a la defensa propia) *y se ha llegado a creer que una bofetada se puede contestar con un tiro, para después venir a decir a la corte, 'le pegué un tiro en defensa propia' "*, y después aludir directamente al abogado defensor diciendo, *"mientras no sea enmendado, es la ley en Puerto Rico en esta materia —y lo sabe mi distinguido compañero el licenciado Tormes, que es miembro de la Legislatura,"* pudo transmitirse a la mente del jurado la idea de que el juez opinaba que el acusado en el presente caso se había extralimitado al defenderse y que no tenía derecho a que el jurado considerase su caso como uno de defensa propia.

■ Existió otra circunstancia, además, que necesariamente debió perjudicar los derechos sustanciales del acusado y fué la siguiente: al terminar la práctica de la prueba y quedar listo el caso para los informes del fiscal y de la de-

fensa, cuando el fiscal había empezado a informar su caso al jurado, el juez lo interrumpió en la siguiente forma:

"¿Me permite el fiscal . . . ? Yo deseo que el abogado defensor ratifique o rectifique su teoría. El abogado defensor expuso la teoría de la defensa propia, que el acusado actuó en defensa propia. En la declaración del acusado él ha insistido en que estaba en un estado de demencia con el golpe que recibió en la frente, habiendo actuado bajo el impulso de ese estado de demencia." (Trans., pág. 136.)

Más tarde, en el curso de sus instrucciones, vuelve la corte a insistir en esta cuestión en la siguiente forma:

"Yo quise aclarar y que el abogado defensor aclarara ante ustedes y en corte abierta, si sostenía su teoría de defensa propia, o si quería rectificarla de acuerdo con la declaración que prestó el acusado." (Instrucciones, pág. 9.)

En justicia al acusado el jurado no debió oír tales manifestaciones. Equivalen a indicar el juez al jurado que en su opinión el acusado no tiene derecho a alegar la legítima defensa, y como al establecerla, el acusado tuvo que admitir naturalmente que había sido el autor de la muerte, al descartar la defensa propia el jurado indefectiblemente tendría que rendir un veredicto declarándolo culpable de homicidio voluntario.

La experiencia nos ha enseñado que aunque el jurado considera al abogado defensor y al fiscal partes interesadas en sus respectivas posiciones y recibe sus opiniones sobre la inocencia o culpabilidad del acusado con la consiguiente reserva, no asume igual actitud con respecto a las manifestaciones del juez. En él ven al árbitro imparcial, sin más interés en la contienda que el de que se haga verdadera justicia, y como por razón de su cargo y de su profesión lo consideran su superior en materia de apreciación de pruebas, su opinión sobre la inocencia o culpabilidad del acusado es para ellos generalmente decisiva. Por esa razón el juez debe ser muy parco y evitar hasta donde sea posible cualquier gesto

o manifestación que pueda ser interpretado por el jurado como indicativo de su opinión sobre los méritos del caso. El juez puede hacer a un testigo cualquier pregunta que crea necesaria para aclarar, en bien de la justicia, cualquier punto obscuro que pueda haber quedado después de los interrogatorios del fiscal y de la defensa; pero no debe examinar a un testigo con el propósito de contradecirlo o desacreditarlo ante el jurado. Esa misión está reservada al fiscal y a la defensa.

No abrigamos duda alguna de que la corte cometió los dos primeros errores que le imputa el acusado.

■ Aunque la corte inadvertidamente omitió ciertos detalles al hacer la relación de la prueba, tan pronto fué advertida de la omisión rectificó y transmitió al jurado la correspondiente instrucción subsanando así el defecto en la exposición de la evidencia. Por consiguiente, no existió este error.

■ No podemos convenir con la defensa en que el veredicto necesariamente es contrario a la evidencia y a derecho. Ya hemos dicho que el acusado estableció un caso prima facie de defensa propia, incumbiendo por tanto al jurado, luego de ser correctamente instruído, sobre la ley aplicable al caso, de apreciar la credibilidad de los testigos y de colocarse en las mismas circunstancias en que se hallaba el acusado al momento de la muerte, determinar si la evidencia aducida justificaba al acusado en creer que seguiría recibiendo grave daño corporal o que se hallaba en inminente peligro de perder su vida, o si la evidencia presentada en relación con la defensa propia produjo en su mente duda razonable sobre la culpabilidad del acusado. Grigsby's Criminal Law, pág. 514, nota 89, y casos citados. No podemos, por lo tanto, sostener que el veredicto sea contrario a la prueba. Sólo podemos convenir con la defensa en que el acusado no tuvo una justa oportunidad de que el jurado considerase la evidencia a la luz de los principios legales aplicables a la legítima defensa.

Habiéndose cometido los dos primeros errores señalados por el acusado, y lesionándose con ello sus derechos sustanciales, *procede revocar la sentencia apelada y devolver el caso a la corte inferior para la celebración de un nuevo juicio.*

El Juez Asociado Señor Travieso no intervino.