EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JOSÉ BARTOLOMEI BARTOLOMEI, acusado y apelante.

Núm. 13706.—*Sometido:* Junio 1, 1949. *Resuelto:* Diciembre 16, 1949.

*Benjamín Ortiz* y *Álvaro Ortiz,* abogados del apelante; *Hon. Procurador General Vicente Géigel Polanco* y *J. Rivera Barreras, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR NEGRÓN FERNÁNDEZ emitió la opinión del tribunal.

José Bartolomei Bartolomei fué convicto por un jurado de un delito de asesinato en segundo grado y sentenciado a una pena de quince a veinte años de presidio. En su alegato, en apelación, cuatro son los errores que señala.

El segundo de ellos es al efecto de que como consecuencia de una pregunta hecha al acusado mientras éste declaraba, por el juez de la corte inferior, en presencia del jurado, fué privado de un juicio imparcial y justo por el estado mental

de prejuicio creado en la mente del jurado con la sugestión contenida en dicha pregunta. Creemos que tiene razón el apelante. Veamos:

La prueba de cargo, que con relación a los hechos consistió de las declaraciones del testigo Macario Rivera Rojas, encargado la noche de los sucesos del restaurante Las Tres Palmas, en Bayamón, y Porfirio Vega, Jefe de la Policía Insular del Distrito de Arecibo, demostró que alrededor de la una y media de la mañana del 31 de agosto de 1946, ya disponiéndose a cerrar dicho restaurante, llegaron allí tres personas, una de ellas de apellido Alemán, y dos acompañantes, tomaron un refresco y comieron y al salir del restaurante surgió una discusión llegando pocos minutos más tarde, en automóvil, el Jefe Vega, vestido de civil, y su esposa con otros acompañantes, los que entraron al restaurante para comer algo, quedándose el detective Angel Luis Collazo, que manejaba el vehículo y también vestía de civil, esperando en el automóvil. En esos momentos se oyó un disparo, saliendo poco después el Jefe Vega a investigar lo sucedido, en cuyo momento el acusado corría de la carretera en dirección al restaurante. Fué agarrado por el Jefe Vega, quien le dijo que se quedara quieto que él era capitán de la policía insular, lo que le repitió el encargado del restaurante Rivera Rojas. Al aflojar el Jefe Vega su agarre, corrió el acusado hacia la carretera en dirección a un camión "pick up", siguiéndole entonces Vega, el detective Collazo y Rivera Rojas. Al subir el acusado al estribo del camión y tomar en sus manos un revólver, apuntó hacia ellos diciéndoles "si avanzan disparo". El Jefe Vega hizo un movimiento con sus manos para enseñarlas al acusado, así como el detective Collazo, para que viera que estaban desarmados y al echar un pie hacia atrás, alguien se dirigió a Vega diciéndole "cúbranse con las palmas que los matan". Al colocarse tanto Vega como el detective Collazo detrás de una palma, el acusado hizo un disparo hacia ellos, siendo entonces que Vega y Collazo dispararon hacia el camión, el cual en ese momento echó a caminar en

dirección de Bayamón, luego de hacer Collazo tres disparos y uno Vega. Collazo fué encontrado herido y llevado al Hospital de Distrito de Bayamón donde falleció.

La declaración del acusado, dada al fiscal del distrito en el curso de su investigación a raíz de los hechos, fué presentada por el fiscal y admitida sin oposición del acusado. En dicha declaración el acusado, al contestar una pregunta del fiscal en el sentido de por qué había disparado, manifestó: "Bueno, yo le disparé bajo una ligereza o bajo unos palos, pensaba en que nos podían disparar y herir a uno de nosotros tres." El acusado, en el juicio, a preguntas del fiscal, declaró no recordar que el fiscal le hubiera hecho la pregunta que aparecía contestada con las anteriores palabras.

La prueba de defensa tendió a demostrar que la noche de los sucesos el acusado llegó al restaurante Las Tres Palmas de regreso de una boda, en Vega Baja, en compañía de su hermano Pablo y un amigo de nombre Gilberto Rodríguez Meléndez, a comer algo; que estando allí llegó un hermano de este último a pedirle explicaciones a Gilberto de por qué no le había llevado una pipa de cerveza a la boda, reciminándole porque lo hizo quedar mal; que discutieron y salieron hacia afuera y afuera se agarraron a pelear; que dándose cuenta de ello el acusado y su hermano Pablo, salieron a separarlos, pero en ese momento otra persona que había venido guiando el automóvil en que llegó el hermano de Gilberto, de nombre Juan Amalio Alemán, en forma acalorada fué a separar a los hermanos Rodríguez Meléndez; que se dirigió hacia el carro, del cual sacó un machete y atacó tanto a Gilberto como al acusado y a su hermano Pablo, tirándoles tajos; que éstos le gritaban a Alemán que no hiciera eso y que al retroceder el acusado hasta la salida del restaurante Las Tres Palmas, luego de haber Alemán herido a Gilberto en la rodilla, Pablo, el hermano del acusado, le disparó a Alemán, hiriéndole y quitándole entonces Gilberto el machete a Alemán; que al regresar éste a su automóvil, Gilberto le dió con el machete "de plano" a Alemán; que en ese momento Gilberto y el

hermano del acusado corrieron hacia el camión en que habían venido, que estaba en la carretera, mientras un grupo de personas agarraba al acusado, quien al soltarse corrió hacia el camión subiéndose al estribo del lado del guía; que su hermano Pablo, mientras echaba a caminar el vehículo, le entregó el revólver para que no dejara acercarse a nadie y evitar así que los cercaran; que el acusado tomó el revólver en sus manos y apuntó al grupo conminándoles a que no se acercaran porque disparaba; que el grupo, que se acercaba en actitud agresiva, se dirigió hacia detrás de una de las palmas, y al arrancar la guagua salió un disparo de detrás de la palma, seguido de otras detonaciones, disparando en ese momento el acusado; que el acusado no conocía al Jefe Vega; que cuando lo agarraron, alguien le dijo: ''Yo soy el jefe Vega, yo soy de la policía'', pero que como estaba vestido de paisano, y no se identificó en otra forma, él, a su vez, no pudo identificarlo.

Mientras el acusado ocupaba la silla testifical, ocurrió lo siguiente:

(Interroga su abogado)
''P. ¿Cuando usted disparó, usted tenía la intención de matar a alguien?

R. No, señor, en ningún momento.

P. ¿Y por qué disparó usted?

R. Yo también lo hice en defensa de nosotros, porque la actitud de la gente aquélla, a mi entender, era una actitud agresiva, no era una actitud buena; y yo traté de defenderme y de defender a los otros.

La Corte:

P. *¿A usted no le habían dicho cuando lo agarraron 'yo soy el Jefe Vega' o 'yo soy de la policía'?*

R. *Sí, pero como el señor ése estaba vestido de paisano, yo no pude identificarlo, porque él no se identificó conmigo.*

P. *¿No le dijo a usted el señor Macario Rivera 'ese señor es el Jefe Vega'?*

R. Esas palabras yo no las oí.

Defensa:

P. Siga.

R. Entonces seguimos rumbo hacia Río Piedras, camino hacia Río Piedras.

Defensa: Eso es todo con el testigo.'' (Bastardillas nuestras.)

(Interroga el Fiscal)

P. ¿Y los demás amigos suyos qué hacían mientras tanto?

R. Yo no los vi a ellos en ese momento.

P. Cuando usted se acercó a la cafetería corriendo que dos personas lo aguantan...

R. Yo no me acerqué a la cafetería... Fué un grupo de personas que me agarraron: tampoco fueron dos personas, los que me agarraron.

P. ¿Entonces lo agarraron a ustedes más de dos personas?

R. Sí, señor, por los brazos.

P. ¿No es cierto que el Capitán Vega lo cogió por los brazos, pero sin presión, que luego lo aflojó y ahí usted se fué?

R. Sí, señor. *Él no me hizo nada, porque yo no lo conocía a él; no sé tampoco si él era policía.*

P. ¿Pero él no sacó el revólver para usted?

R. Yo tampoco saqué para él ningún revólver.

P. ¿Ni el otro que lo conminó a usted?

R. No, señor.

La Corte:

P. ¿No le dijo alguien 'yo soy policía'?

R. Uno de ellos me dijo 'yo soy policía'; como estaba vestido de paisano—como dije anteriormente— yo no pude identificarlo; porque él no se identificó tampoco conmigo en ningún momento.

P. *¿Y qué más quería usted si él le dijo 'soy policía'?*

Defensa: Excepción a las preguntas de la corte.'' (Bastardillas nuestras.)

La importancia de la interpelación de la corte al acusado, en presencia del jurado, surge de lo que éste, al juzgar toda la prueba vertida, hubiera determinado en cuanto a la identificación del Jefe Vega por el acusado.

Es regla establecida en casi todas las jurisdicciones que el juez que preside un juicio no debe hacer preguntas o comentarios que por su alcance, forma, expresión e implicaciones puedan llevar al jurado su opinión o sugestión sobre la culpabilidad del acusado, o sobre el peso o suficiencia de la evidencia, debiendo limitarse a observar en su interrogatorio de los testigos los principios que gobiernan el examen de los

testigos en general. *Pueblo* v. *León,* 53 D.P.R. 429 (1938); *Connley* v. *United States* (C.A. 9, 1931), 46 F.2d 53; *Callahan* v. *United States* (C.A. 10, 1929), 35 F.2d 633; *Cusmano* v. *United States* (C.A. 6, 1926), 13 F.2d 451, *cert.* denegado en 273 U. S. 773, 71 L. ed. 885; *Barron* v. *United States* (C.A. 1, 1925), 5 F.2d 799; *People* v. *Silva* (1924), 67 Cal. App. 351, 227 Pac. 976, y monografía en 84 A.L.R. 1172.

En el examen o contrainterrogatorio del acusado es regla también que los comentarios del juez no constituyen motivo para revocación a menos que los mismos sean de tal naturaleza que tiendan razonablemente a influir las mentes del jurado contra el acusado, privándole de su derecho a un juicio justo e imparcial. *Daly* v. *United States* (C.A. 7, 1929), 33 F.2d 443. Véase monografía en 65 A.L.R. 1270, siendo perjudiciales los que tiendan a, o puedan influir en el jurado, adversamente al acusado.

La determinación de si un comentario del juez en el transcurso de un juicio es perjudicial o no al acusado, gira alrededor del alcance de dicho comentario, de la influencia que el mismo pueda ejercer en el jurado y de sus efectos en relación con la oportunidad de defensa del acusado. Depende de las circunstancias de cada caso en particular. No habremos de enumerar aquí, pues, casos de otras jurisdicciones en que se ha sostenido que comentarios de un juez han sido, unos, perjudiciales, y otros, no perjudiciales al acusado. Véanse a ese respecto monografías 10 A.L.R 1116 y las ya citadas en 65 A.L.R 1270 y 84 A.L.R 1172. En nuestra jurisdicción, en juicios por jurado, el juez está llamado a hacer un resumen de la evidencia.([1]) No se le autoriza a expresar, directa o indirectamente, su opinión sobre los hechos ni sobre la credibilidad de los testigos. Corresponde al jurado la apreciación de la prueba y el crédito que ella le merezca. En línea con ese principio cardinal de nuestro sistema de justicia cri-

---

([1])Artículo 233, inciso 8, Código de Enjuiciamiento Criminal; *Pueblo* v. *Rodríguez,* 69 D.P.R. 980 (1949); *Pueblo* v. *Valentín,* 63 D.P.R. 787 (1944); *Pueblo* v. *Lebrón,* 61 D.P.R. 657 (1943).

minal, este Tribunal, en el caso de *Pueblo* v. *León,* supra, se expresó en la siguiente forma, a la pág. 440:

"... Por esa razón el juez debe ser muy parco y evitar hasta donde sea posible cualquier gesto o manifestación que pueda ser interpretado por el jurado como. indicativo de su opinión sobre los méritos del caso. El juez puede hacer a un testigo cualquier pregunta que crea necesaria para aclarar, en bien de la justicia, cualquier punto obscuro que pueda haber quedado después de los interrogatorios del fiscal y de la defensa.; pero no debe examinar a un testigo con el propósito de contradecirlo o desacreditarlo ante el jurado. Esa misión está reservada al fiscal y a la defensa."

Y en el caso de *Pueblo* v. *Tirado,* 38 D.P.R. 887, se dijo, a la pág. 890:

"Ha sostenido este tribunal, el derecho del jurado para aquilatar, como único juez, la prueba, sin sugestiones que le perturben en el acto de pronunciar su veredicto. Y ha declarado asimismo que no puede, bajo ningún concepto, hacerse entrever al jurado el juicio que cada uno de los elementos de prueba. merezca al juez que comunica las instrucciones, ni es lícito sugerirles nada que tienda a desviar su criterio de lo que entiende honradamente que es justo e imparcial (*El Pueblo* v. *Rodríguez,* 11 D.P.R. 235)."

■■ En el caso de autos, la interpelación del juez al acusado con su pregunta "¿y qué más quería Ud. si él le dijo. 'soy policía'?" consituye indudablemente un error perjudi-cial al acusado. Veamos por qué. La teoría de defensa fué al efecto de que el acusado hizo el disparo bajo tales circunstancias que le llevaban a abrigar fundado temor de muerte o grave daño corporal por parte de un grupo de personas que le seguían, luego de haberse librado de quienes le agarraban y haber corrido hasta el camión donde ya estaba su hermano, situado en el guía, y su amigo Gilberto; que tanto el Jefe Vega como el detective Collazo estaban vestidos de paisanos (hecho éste demostrado también por la prueba de cargo); que momentos antes tanto él como su hermano y Gilberto habían sido atacados y uno de ellos herido por un tal Alemán; que ni el acusado ni sus acompañantes conocían al Jefe Vega ni al detective Collazo y que a pesar de haberle dicho

uno de ellos al agarrarlo que era policía, él, que no conocía a Vega, no podía determinarlo, por lo que consideró que el grupo de personas que fué tras él hacia el camión iba a atacarlos; que por ello trató de impedir que se acercaran al vehículo en el cual ya se disponían a salir de allí, y que al esconderse varias de esas personas detrás de una palma y oír una detonación, hizo un disparo.

Es obvio, pues, que para el acusado en este caso era esencial que el jurado, libremente y sin insinuación de clase alguna por parte de la corte, determinara si bajo las circunstancias de los hechos sometidos a su consideración, en su totalidad, el acusado había tenido suficiente base para pensar que efectivamente era un grupo de personas que le perseguía o acechaba con ánimo agresivo y de causar daño a él o a sus acompañantes, o si, por el contrario, actuó a sabiendas de que entre esas personas se encontraban agentes del orden público que no podían tener ánimo ni intención de agredirle. Aun cuando el jurado no creyera que el disparo del acusado sobrevino, según tendió a demostrarse, después de un disparo hecho de detrás de la palma con la que se protegieron varios de los "civiles", era de su exclusiva incumbencia determinar, no obstante esto, si de acuerdo con los hechos establecidos por la prueba del acusado, las circunstancias eran de tal naturaleza que le hubieran podido llevar a creer razonablemente que estaba en inminente peligro de muerte o de grave daño corporal. Para un sereno análisis de la prueba y la determinación de la culpabilidad o inocencia del acusado bajo la garantía constitucional de un juicio justo e imparcial, era requisito indispensable que la declaración del acusado respecto a la identificación del Jefe Vega, en relación con su teoría de defensa, fuera al jurado sin la insinuación del tribunal de que las palabras de Vega al acusado eran suficientes para que el acusado reconociera su identidad como jefe de la policía, no obstante estar vestido de paisano. Nada hay en el récord que indique que el Jefe Vega o el detective Collazo le mostraran sus placas en ese momento al acusado. Con la in-

sinuación del tribunal en su interpelación al acusado de "¿y qué más quería Ud. si él le dijo 'soy policía'?" se cerró para el acusado toda oportunidad de que el jurado pudiera, en su apreciación de la prueba, determinar que con las palabras de Vega no había habido suficiente identificación para que el acusado, en la excitación del momento por los sucesos que se habían desarrollado inmediatamente antes, pudiera quedar convencido de tal identidad y no sospechar que se trataba de un ardid. Es razonable pensar que el jurado, por el prestigio y respeto que dimana la destacada posición del juez, se sintiera influído por sus palabras y tomara como buena la conclusión implicada en las mismas. Creemos, por tanto, que hubo error y que éste fué perjudicial y no quedó curado por las instrucciones generales de que el jurado es el solo juez de los hechos. 53 Am. Jur., *Trial*, sec. 94, pág. 85.

Por las conclusiones a que llegamos en cuanto al segundo error señalado, es innecesario considerar los demás.

*Procede la revocación de la sentencia apelada y la devolución del caso a la corte inferior para la celebración de un nuevo juicio.*

El Juez Asociado Sr. Snyder disintió.