EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ÁNGEL LUIS ALETRIZ ROMERO, acusado y apelante.

Número: 16525    Resuelto: 12 de junio de 1962

648

*Joaquín Lago Padín,* abogado del apelante; *J. B. Fernández Badillo, Procurador General* y *Héctor R. Orlandi Gómez, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Asociado señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados señores Santana Becerra y Rigau.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

El apelante fue convicto por un jurado del delito de asesinato en primer grado, consistente en que en 7 de diciembre de 1957, con malicia premeditada y deliberación dio muerte ilegal a Alcides Rodríguez Villanueva, c/p Alcides Villanueva.

En este recurso([1]) señala la comisión de tres errores. En los dos primeros sostiene que el veredicto es contrario a la prueba y a derecho y que no se probó adecuadamente la

---

([1]) El acusado apeló por su propio derecho pero por resolución de 16 de mayo de 1958 designamos al abogado Joaquín Lago Padín para que le ofreciera asistencia legal a fin de que pudiera ejercitar plenamente su derecho de apelación. Dicho letrado dio esmerado cumplimiento a nuestra resolución.

deliberación y premeditación, elementos imprescindibles en el delito de asesinato en primer grado.

"La prueba de cargo—según el resumen correcto que de la misma hace el Procurador General—demostró que el acusado—apelante conocía a la víctima desde mucho tiempo atrás. El padre del acusado-apelante había sido encarcelado después de celebrársele un juicio en el cual la víctima declaró como testigo de cargo. En distintas ocasiones la víctima había expresado su temor a las represalias que podría tomar el padre del acusado-apelante al salir de la cárcel. En este sentido dijo el testigo de cargo Francisco Villanueva Santiago que el mismo día de los hechos la víctima expresó en presencia del acusado-apelante lo siguiente: 'yo tengo que estar encerrado bajo la cama porque me están velando porque va a salir el padre de él porque dijo que me iba a dar.' A esto respondió el acusado-apelante, 'si no es macho como yo, yo también te puedo matar también'. (T.E. pág. 49), y que 'si tú no andas espabilado, te mato', y 'si no es macho para eso, yo te pueda matar ahora mismo'. (T.E. pág. 54.) El testigo de cargo Mariano Candelaria Ortega también declaró que en cierta ocasión el acusado-apelante le manifestó que iba a matar a 'ese muchacho Alcides' y 'que si no lo mataba a él, mataba a cualquiera en esa línea allá'. (T.E. pág. 17.)

"El día de los hechos el acusado-apelante se encontraba en la tienda de Emilio Olavarría cuando llegó Alcides, su víctima, quien permaneció fuera de la tienda. El primero salió de la tienda y le dijo 'Ven acá', se le acercó y le dio una bofetada; acto seguido sacó un puñal de doble filo infiriéndole tres heridas sin que mediaran más palabras entre ambos. La última de estas heridas le provocó la muerte a Alcides al día siguiente. La prueba de cargo también demostró que la misma noche en que ocurrieron los hechos el acusado-apelante admitió que había matado 'a uno'. (T.E. pág. 37–40)." (Informe del Procurador General, pág. 3.)

Arguye el apelante que la prueba de cargo fue "altamente interesada y prejuiciada" y que ninguno de los testigos de cargo "arroja luz alguna, para que el jurado pueda determinar si hubo aquí la premeditación y deliberación que harían del asesinato uno en primer grado". Apoya su planteamiento en supuestas contradicciones en las declaraciones de los testigos de cargo. ■

Corresponde al jurado por ley la facultad de juzgar sobre la credibilidad de los testigos y no alteraremos sus conclusiones a menos que se demuestre que abusó de esas facultades al dar crédito a los testigos de cargo. *Pueblo* v. *Ramírez,* 50 D.P.R. 234; *Pueblo* v. *Bartolomei,* 70 D.P.R. 698, 704. El mero hecho de que en el testimonio de un testigo se advierta alguna contradicción no obliga al jurado a rechazar el resto de dicho testimonio pues aquí, según sostiene correctamente el Procurador General, no impera la máxima *"falsus in uno, falsus in omnibus".* *Ortiz* v. *Martorell,* 80 D.P.R. 544, 548; *Pueblo* v. *Soto,* 73 D.P.R. 55, 81; *Pueblo* v. *Portalatín,* 75 D.P.R. 159; *Pueblo* v. *Roque,* 53 D.P.R. 919; *Pueblo* v. *Ortiz,* 45 D.P.R. 835. ■

Por otro lado, la prueba de cargo contiene los elementos de la malicia premeditada y la deliberación. De acuerdo con esa prueba no medió provocación ni ataque por parte de la víctima y el acusado ya antes había hecho manifestaciones en el sentido de que iba a matar a Alcides, la víctima. En *Pueblo* v. *Túa Cintrón,* 84 D.P.R. 39, 58 (1961), dijimos:

"El expresar que se va a dar muerte a otro es incuestionablemente un hecho afirmativo del cual el jurado puede determinar de manera expresa la malicia premeditada: —la manifestación de una deliberada intención de quitar la vida a un semejante, *Cf. People* v. *Gorshen,* 336 P.2d 492; *People* v. *Cox,* 153 P.2d 362; *People* v. *Greig,* 95 P.2d 936; —siendo la malicia premeditada ingrediente del asesinato tanto de primer como de segundo grado. *Cf. People* v. *Lewie,* 344 P.2d 861; *People* v. *Cayer,* 228 P.2d 70; *People* v. *Bender,* 163 P.2d 8. Tal manifestación puede también ser un hecho del cual el jurado infiera una muerte deliberada y premeditada—característica sólo del

asesinato en primer grado—dependiendo de todos los demás hechos y circunstancias que aparezcan de la prueba; una muerte que requiere un proceso de reflexión y de pensamiento; darle vueltas al hecho en la mente, pesar la decisión de matar y las razones a favor y en contra de tal curso a seguir consciente de sus consecuencias, y una intención definida de matar resultado de tal proceso de reflexión y pensamiento."

Los dos primeros errores no fueron cometidos. Por el tercero se ataca, como error perjudicial al acusado, las siguientes instrucciones transmitidas al jurado:

"Es decir, señores del Jurado, que hay una línea divisoria, hay una guardarraya, una línea fronteriza entre asesinato en primer grado y asesinato en segundo grado y esa línea fronteriza consiste en la deliberación. No habiendo deliberación, esto es, no habiendo el designio de matar, no hay primer grado. Entonces hay segundo grado.

"He de deciros, para que ustedes lo tengan en mente, lo que quiere decir premeditación. De acuerdo con la jurisprudencia de nosotros en Puerto Rico y la ley, el término premeditación significa que el acto fue preconcebido y realizado después de haberse reflexionado, y el término deliberación, que yo lo llamé la línea fronteriza entre primer y segundo grado, significa un estado de serenidad o sangre fría. No significa calcular o reflexionar durante mucho tiempo, sino una intención o propósito de matar ejecutado por el acusado en un estado de serenidad como consecuencia del deliberado propósito de satisfacer una pasión o venganza. Con estas dos acepciones de premeditación y deliberación que os he hecho, ustedes tienen base para calibrar con serenidad, sin prejuicio alguno, la prueba de este caso." (Informe Procurador General, pág. 5.)

Argumentando este error el apelante se expresa así:

"A nuestro juicio, el Hon. Juez, al dar estas instrucciones a las damas y caballeros del Jurado, confundió lamentablemente los términos 'deliberación y premeditación', al identificar erróneamente el término 'deliberación' con la frase 'intención para matar'. De la explicación que el Hon. Juez da al Jurado al definir lo que es deliberación diciendo 'no significa calcular o reflexionar durante mucho tiempo, sino *intención o propósito* de matar . . . .', el Jurado razonablemente, y al interpretar

como legos que son una materia de tan difícil comprensión entendería que toda vez que el acto se realizó con propósito o intención de matar, el delito cometido *tendría* que ser uno de primer grado. No le explicó el Hon. Juez al Jurado, como debió haberlo hecho, que es posible que exista el designio de matar, sin existir deliberación para ese designio, en cuyo caso no existiría un asesinato en primer grado, sino en segundo grado." (Informe Procurador General, pág. 5.)

Tiene razón. En *Pueblo* v. *Blanco*, 77 D.P.R. 767, dijimos que la intención específica de matar es un elemento integrante del delito de asesinato en primer grado y que dicha intención definida de matar puede estar presente también en el delito de asesinato en segundo grado, aunque no es necesario que siempre lo esté. El jurado pudo entender perfectamente en este caso que si había designio de matar el asesinato era uno en primer grado y que en ausencia de ese designio el asesinato era en segundo grado. De suerte que una vez el jurado encontraba probado que el acusado infirió las heridas a la víctima con el designio de matarla, el delito cometido sería necesariamente el de asesinato en primer grado. Las demás instrucciones transmitidas al jurado sobre el significado de deliberación, ni las otras referentes a los grados del delito y los distintos veredictos que podía rendir, subsanaron a nuestro juicio, el error cometido.

Del récord surge otro grave error perjudicial al apelante. Aun cuando dicho error no ha sido objeto de señalamiento, ni fueron debidamente objetadas en el tribunal a quo las actuaciones que lo motivan, debemos considerarlo al resolver el recurso, máxime cuando la sentencia apelada es de reclusión perpetua y además se sirven mejor así los más altos fines de la justicia.(2) Nos referimos a la continua e injustificada intervención del Juez con los testigos, interrogándo-

---

(2) En cuanto a nuestra facultad para conocer de errores fundamentales que aparecieren en los autos y fallar sobre los mismos aun cuando no se hubiere interpuesto objeción a ellos, véase: 4 L.P.R.A. sec. 36; 34 L.P.R.A. sec. 1171; *Pueblo* v. *Túa*, 84 D.P.R. 39 (1961), escolio 8 y casos allí citados.

los intensamente, aun antes de que el fiscal y el abogado defensor terminaran sus interrogatorios. El propio acusado, quien declaró en su defensa, fue sometido por el Juez a un mordaz interrogatorio con el propósito de contradecirlo y desacreditarlo ante el jurado, privándolo así de un juicio justo e imparcial. Lo que el récord revela es que el Juez desempeñó en este caso con gran habilidad la misión que la ley reserva al fiscal. Veamos el récord.

El primer testigo ocular de los hechos presentado por el fiscal fue Mariano Candelaria Ortega. Mientras el fiscal lo interrogaba el Juez interrumpió en varias ocasiones con preguntas tendientes a identificar "el puñalito" que según el testigo portaba el acusado. Cuando el abogado defensor contrainterrogaba al testigo el Juez le interrumpe con el siguiente interrogatorio:

"A preguntas del Hon. Juez, declaró:—

"P. ¿Usted le acaba de contestar al abogado que de eso que le presenta no vio nada, sino el cabo? —Sí, señor.

"P. ¿Cuando él lo tenía espetado en la paja de la casa? —Me preguntó del seno.

"P. ¿Cuando lo tenía en el seno? —Sí, señor.

"P. ¿Cómo era el techo de la casa? —Es una casita de paja. Es una casa chiquita y ésta es la puerta y está el cuchillo puesto en la última andana de la paja.

"P. ¿Cómo le llaman a eso, las barbillas? —Sí, señor.

"P. ¿Ahí lo tenía? —Sí, señor.

"P. ¿Cuando usted nos dice que este señor acusado había llamado a Alcides frente a la tienda, que Alcides bajó, usted dice que el acusado le mandó con el puñal, que lo agredió con el puñal, usted vio el puñal? —Yo le vi el puñal, lo vi cuando le mandó. Él bajó de la tienda, el acusado, y llamó a Alcides que estaba hablando conmigo.

"P. ¿Cuando lo agredió qué fue lo que usted vio? —Le dijo a Alcides, 'Ven acá'.

"P. ¿No quiero que repitas eso. Quiero que me digas si viste cuando éste agredía a Alcides? —Sí, señor. Vi cuando le hizo así.

"P. ¿Lo viste? —El puñal no lo vi, pero vi cuando le hizo así.

"P. ¿No viste ningún arma en sus manos? —No sabía si era puñal o un cuchillo.

"P. ¿Viste que le hizo así? —Sí, señor.

"P. ¿Y que lo agredió? Le tiró.

"P. ¿Cuántas veces le tiró? —Tres veces.

"P. ¿En cuanto al puñal que viste metido en la paja del techo de la casa y el que viste en el seno de él cuando conversaba debajo del palo de mangó, cómo era el cabo? —El cabo se le veía por encima.

"P. ¿Cómo era? —Se lo veía por encima.

"P. ¿Cómo era? ¿Un cabo así de hierro en color? —Del color del moho porque era mohoso.

"P. ¿Era liso o tenía alguna obra? —No le ví eso.

"P. ¿Liso? —Sí, señor.

"P. —¿En qué momento fue que cayó Alcides al suelo, cuando el acusado lo agredía, cuando le mandó, como tú dices, la primera vez, la segunda vez o la tercera vez? —En la tercera vez.

"P. ¿Cómo cayó? —Cayó así, de boca.

"P. ¿Dónde lo viste tú? —Yo salí corriendo a cogerlo a él.

"P. ¿Lo viste? —Sí, señor.

"P. ¿En el suelo? —Sí, señor.

"P. ¿Le viste sangre? —Sí, señor.

"P. ¿Le viste sangre? —Le ví sangre.

"P. ¿Le viste sangre? —Sí, señor.

"P. ¿Le viste alguna herida? —Cuando lo cogí, en el mollero, que lo cogí para levantarlo, entonces le noté las puñaladas.

"P. ¿Qué tiempo estuviste tú allí? —Cuando fui a cogerlo.

"P. ¿Qué tiempo estuviste con él allí cuando lo viste herido? —Como un minuto porque llegó Cecilio Morales y me dijo, 'vete a buscar un carro para llevarlo' y entonces lo fui a buscar.

"P. ¿Viniste con el carro? —Ya se lo habían llevado en otro carro.

"P. ¿A dónde fuiste tú? —A La Palma.

"P. ¿Fuiste al pueblo? —Por la noche estuve, que fueron a buscarme allá.

"P. ¿Después de haber visto a Alcides en el suelo volviste a verlo? —No, señor. Porque se lo llevaron. Después que se lo llevaron no lo volví a ver porque lo trajeron para el Distrito.

"P. ¿Volvieron a llevarlo al barrio al sitio donde vivía? —Lo llevaron.

"P. ¿A Alcides? —No lo llevaron el mismo día. Al otro día lo llevaron a casa del abuelo de él.

"P. ¿Estaba muerto? —Sí, señor.

"P. ¿Lo viste? —Sí, señor. En la casa lo ví muerto cuando lo llevaron en la caja.

"P. ¿Lo enterraron? —Sí, señor.

"P. ¿Cuándo? —Al otro día.

"P. ¿Lo velaron? —Sí, señor.

"P. ¿Estuviste allí? —A velarlo no.

"P. ¿Y al entierro? —Tampoco." (T.E., págs. 31 a 35.)

El próximo testigo de cargo, William Sierra Mieles, había declarado que el día de los hechos se encontraba en casa de su novia hablando con ella cuando el acusado llegó y dijo: "Ana, ábreme la puerta. Maté a uno y me hirieron." El abogado defensor le había preguntado al testigo que si era o no cierto que él tuvo disgustos con el acusado porque le pegaba a su esposa y el acusado intervenía en defensa de ella. El testigo contestó que no, que eso no era verdad. El Juez interrumpe con el siguiente interrogatorio:

"A preguntas del Hon. Juez, declaró:

"P. ¿Alguna vez le ha pegado a su esposa? —No, señor.

"P. ¿Ud. ha peleado con ella violentamente? —No, señor.

"P. ¿Ha sido buen esposo y la ha tratado bien? —Seguro."

Ahí termina el interrogatorio de este testigo y después del receso de medio día ocupa la silla testifical Francisco Villanueva Santiago, quien dijo haber presenciado los hechos y haber oído las amenazas que el acusado había hecho a la víctima. Mientras el fiscal lo examinaba sobre estos hechos el Juez interrumpe con el siguiente interrogatorio:

"A preguntas del Hon. Juez, declaró:

"P. ¿Qué hechos fueron los que usted vio? —Los hechos que ví, que éste lo amenazó por la tarde temprano. Después volvieron a encontrarse.

"P. ¿Los vio juntos después? —Sí, señor. Estábamos juntos todos.

"P. ¿Dónde? ¿A Alcides y a este acusado dónde los vio juntos? —En casa de Chago Pérez estaban juntos.

"P. ¿Allí ocurrió algo? —Entre ellos no había ocurrido nada. Lo único que dijo, 'ya Pey va a salir y me voy a tener que esconder'.

"P. Interesamos que usted diga lo que viera directamente entre Alcides y el acusado. —Entre ellos no hubo nada.

"P. ¿Qué vio usted entre ellos? —Yo sé que éste haló por un cuchillo para cortarlo.

"P. ¿A quién? —A Alcides.

"P. ¿Dónde estaba Alcides en relación con el acusado? —Estaba al lado de la tienda.

"P. ¿Distante? —No, señor.

"P. ¿Pegado a este joven? —Estaba en el camino que viene de allá de la casa de la mujer.

"P. ¿Estuvieron cerca uno del otro? —Sí, señor. Cerquita.

"P. ¿Cuando estuvieron cerca qué vio usted entre ellos? —Que entonces éste le tiró una gaznatada a él y al darle entonces en seguida haló y lo hirió en seguida.

"P. Cuando éste le dio la gaznatada a aquel otro, ¿qué ocurrió, qué pasó en seguida? —Que sobre eso éste cogió y lo cortó. Nada mas. De ahí no sé yo nada más.

"P. ¿Al tirarle la gaznatada éste a él? —Haló en seguida por el cuchillo y lo cortó.

"P. Después que le dio la gaznatada, ¿en seguida? —En seguida.

"P. ¿Aquél no se le tiró encima a éste? —Nada.

"P. ¿Aquél no le respondió con otra bofetada? —No, señor." (T. E., págs. 51 a 53.)

Mientras el abogado le preguntaba al testigo que explicara cómo fue que el acusado se infirió él mismo una herida, el Juez vuelve a intervenir y termina su examen con las siguientes preguntas:

"A preguntas del Hon. Juez, declaró:—

"P. ¿Mientras caminaban en el carro el muerto, sobrino suyo, Alcides, este joven acusado y quién más? —Venía yo, éste, Toño Aletriz, un primo hermano de él.

"P. ¿Mientras todos caminaban en el carro se habló algo? —No se habló nada.

"P. ¿Dijo algo el acusado? —No, señor.

"P. ¿Alcides decía algo? —Ése no habló. Ése ya venía, él no dijo ni media palabra. No dijo, 'aquí me duele', ni se quejó en ningún momento.

"P. ¿Usted dijo que a Alcides lo acompañó hasta el hospital? —Sí, señor.

"P. ¿Como a qué hora llegaron al hospital? —Creo que serían como las diez.

"P. ¿Volvió a verlo usted? —Yo no lo volví a ver porque no volví para acá.

"P. ¿Y él no volvió para allá? —A los dos días lo llevaron allá.

"P. ¿Cómo? —En la caja.

"P. ¿En qué caja? —Cuando se murió.

"P. ¿Del hospital fue muerto para allá? —Sí, señor.

"P. ¿Usted lo vio muerto? —Sí, señor."

(T. E., págs. 57–58.)

El último testigo de cargo, Cecilio Morales Soto, fue sometido por el Juez, sin razón alguna que lo justificara, al siguiente interrogatorio:

"A preguntas del Hon. Juez, declaró:—

"P. ¿Dónde estaba usted? —Arriba en la tienda de Emilio Olavarría.

"P. ¿Usted era dependiente? —No, señor. Llegué en aquel momento.

"P. ¿Mientras estaba usted en la tienda vio a Alcides y al joven acusado? —Yo los ví cuando salieron de la tienda para acá.

"P. ¿Ese mismo día por la tarde? ¿En el momento, momentos antes de la herida que vio usted, le dijo al abogado que había visto cuando este joven acusado le infirió una herida por Dios salve el lugar? —Sí, señor.

"P. ¿Antes de ese instante usted los había visto? —Ellos estaban arriba en la tienda. Yo los ví cuando bajaron.

"P. ¿Cuando bajaron todavía no se había dado la herida en la ingle? —No, señor, eso fue en el camino.

"P. ¿Usted los vio todo el tiempo desde que bajaron? —Como yo no sabía nada. Los ví cuando bajaron. Yo estaba sentado.

"P. ¿Usted les siguió los pasos? —No, señor.

"P. ¿Continuó mirando mientras bajaban? —No, señor. Me quedé sentado y cuando va por la puerta entonces ví que le dio la herida.

"P. ¿Entonces no vio los movimientos que ellos, o alguno de ellos hiciera antes de la puñalada? —No, señor.

"P. ¿Antes de haber visto el puñal? —Lo ví que lo tenía en la mano e hizo así.

"P. ¿Se cayó en ese instante? —Sí, señor.

"P. ¿Alcides? Sí, señor.

"P. ¿Y quién tenía el puñal en las manos? —Luis Aletriz.

"P. ¿Y qué hizo? —Le dio la puñalada y esmandó a correr.

"P. ¿Y usted? —Me quedé cuidando el muchacho en lo que vino el que lo echó al carro.

"P. ¿Usted fue a acompañar al herido? No, señor. Me fui para casa.

"P. ¿Usted conoce a William Sierra? —Sí, señor.

"P. ¿Usted vio a William Sierra esa noche? —Esa noche, después de las heridas.

"P. ¿Lo vio? —Sí, señor. Después de haber pasado todo.

"P. ¿Al acusado lo vio? —Sí, señor.

"P. ¿Usted vio a William y a este joven juntos? —Ellos venían en el mismo carro en que llevaron al difunto.

"P. ¿A William, usted lo vio a él y al acusado juntos en aquel momento de las heridas? —No, señor. Después lo ví en la corte." (T. E., págs. 64 a 66.)

La teoría de defensa del acusado fue la de la defensa propia. Para sostenerla descansó principalmente en su propio testimonio. En el curso de su declaración fue interrogado en varias ocasiones por el Juez. Parte de ese interrogatorio tendió a contradecirlo y a desacreditarlo ante el jurado. Volvamos al récord. El acusado había declarado que sus atacantes le habían quitado una cartera conteniendo $47. El Juez pregunta:

"A preguntas del Hon. Juez, declaró:—

"P. ¿Y de los $47.00 que le llevaron? —Esos $47.00 me encontré que me los llevaron halándome.

"P. ¿La misma noche usted se dio cuenta? —Me dí cuenta.

"P. ¿En qué sitio los tenía usted? —En el bolsillo de atrás, en una cartera, y de la cartera se los llevaron.

"P. ¿Qué persona le llevó la cartera? —Me imagino que tenía que haber sido Juan Feliciano, que me cogió y me echó mano por atrás cuando caí al suelo, que William Sierra me dio la patada.

"P. ¿No sabe quién fue? —Tenía que haber sido uno de ellos.

"P. ¿Usted sintió que le trastearon el bolsillo? —No sentí porque estaba aturdido. Me imagino que tenía que ser uno de ellos porque me echaron mano y me apretaron en ese momento.

"P. ¿Usted sintió que le trasteaban, pero no sabe qué persona fue? —Tenían que ser ellos, eran ocho o nueve y yo no sabía.

"P. Quiero saber si usted en el momento se dió cuenta que le trasteaban el bolsillo, si usted sabía la persona, ¿o si fue que no se dio cuenta que le trasteaban el bolsillo? —Como estaba con la mente así, como aturdida, y la cabeza que no podía moverla, entonces sentí cuando este Juan Feliciano me echó mano por la faldeta y cuando me haló para atrás sentí un movimiento y tenían que haber sido ellos porque no había nadie particular allí más que ellos. Cuando me caí la primera vez, que me dieron un palo, vino William Sierra y me dio una patada y ahí mismo volví a caer al suelo." (T.E., págs. 81 a 82.)

El acusado estaba declarando a preguntas del fiscal que el puñal lo vio por primera vez en casa de Olavarría el día de los hechos. El Juez interrumpe y continúa con el siguiente interrogatorio:

"A preguntas del Hon. Juez, declaró:—

"P. ¿El cuchillo lo encontró en casa de Emilio? —Sí, señor. En el camino.

"P. ¿Está seguro de eso? —Sí, señor.

"P. ¿Es un cuchillo o puñal? —Un puñal.

"P. ¿De eso usted sabe? Es un puñal.

"P. Habiendo sido este puñal el que encontró en casa de Emilio Olavarría, le pregunto, ¿fue este mismo el que usted usó para herir a Alcides? —¿Cómo dice?

"P. Habiendo dicho ya que encontró este puñal en la tienda de Emilio Olavarría, ¿si fue éste el mismo que usted usó para herir a Alcides? —Yo no le puedo decir que es ése. Yo no sé decir si fue ése a cuál sería. Yo me encontré el cuchillo.

"P. ¿Este mismo? —No puedo decir.

"P. ¿Este mismo puñal fue el que encontró usted? —Yo no sé si sería ése.

"P. ¿No acaba de decir que este puñal lo vio por primera vez en la tienda de Olavarría donde lo encontró? —En la tienda no lo ví. En el camino.

"P. ¿Esto fue lo que encontró? —Sí, señor.

"P. ¿Cuando lo encontró ya había recibido los palos? —Sí. señor.

"P. ¿Y usted lo encontró después de haber recibido los golpes en el suelo? —Cuando me empaté, que corrí para arriba. que me llevanté, encontré el cuchillo.

"P. ¿Este mismo? —Sí, señor.

"P. ¿Está seguro? —Sí, señor.

"P. ¿Este mismo? —Sí, señor.

"P. ¿Este fue el que usted usó y a este cuchillo se refería cuando usted decía que hirió a Alcides con un cuchillo que encontró en ese sitio? ¿Fue éste? —Ese mismo fue.

"P. ¿Por qué si fue éste el mismo que encontró, según ha dicho al Jurado, usted al principio dijo que este cuchillo era de su propiedad y que lo tenía? —Yo no dije que lo tenía.

"P. ¿No dijo que ese puñal lo reconocía como de su propiedad? —De mi propiedad no. Yo lo encontré en el suelo.

"P. ¿Con éste lo hirió? —Sí, señor. Tiene que haber sido con ese.

"P. ¿Por qué dijo que no puede decir con cuál fue? —. . . (No contesta).

"P. ¿Usted dijo que este no era el cuchillo con que hirió a Alcides, que no fue este, que había sido con otro? —. . . (No contesta).

"P. ¿No dijo hace un momento, en otra ocasión, que no fue con éste, sino con otro? —Yo no se decir.

"P. ¿Usted dice que no vio a Alcides muerto? —No lo vi muerto porque yo estaba preso.

"P. En el carro, cuando usted venía en el mismo automóvil, ¿Alcides no venía muerto? —No, señor. Venía vivo, pero llegando al Distrito murió.

"P. ¿Decía algo? —No sé si decía algo. Yo venía todo empapado en sangre y aturdido porque yo venía mal de la mente. No sé si decía algo o no.

"P. ¿Usted tampoco decía nada? —No, señor.

"P. ¿Usted puede decir al Jurado dónde le cosieron la oreja? —Sí, señor.

"P. Baje allá y enseñe al Jurado. ¿Cuántos puntos le cogieron ahí? —No sé.

"P. ¿Usted no sabe? ¿No lo curaron? —Seguro. Pero no sé.

"P. ¿Por qué dice que lo cosieron ahí? —Cómo voy a saber si estaba acostado.

"P. ¿No sentía los pinchazos? —No sentía los pinchazos.

"P. ¿No sentía que lo pinchaban así para coserlo? —No. señor." (T. E., págs. 88 a 91.)

Continúa declarando el acusado a preguntas del fiscal y luego el Juez termina el interrogatorio en la siguiente forma:

"A preguntas del Hon. Juez, declaró:—

"P. ¿Cómo se llama la novia de William? —Se llama Carmen Lydia Ortiz.

"P. ¿Carmen Lydia Ortiz qué es de tu mujer? —La mujer mía es sobrina.

"P. O sea, ¿Carmen Lydia es sobrina de tu mujer? —Sí, señor.

"P. ¿Y Carmen Lydia vivía en tu casa? —No, señor. Ella iba a casa cuando yo vivía con la señora mía. A veces iba cuando estaba enferma y le hacía comidas y almuerzo.

"P. ¿El 7 de diciembre del 1957 Carmen Lydia estaba allí en tu casa? —. . . . . (No contesta).

"P. ¿Qué día de la semana era ese día? —Eso no sé el día de la semana. Creo yo . . .

"P. ¿La semana tiene siete días? —No sé si fue viernes o sábado.

"P. ¿Qué día del mes era? ¿A cómo estábamos de mes? —El siete.

"P. ¿Ocho, o nueve o diez? —El siete, me dijeron.

"P. Lo que usted sepa. ¿Usted no tiene idea de qué día era? —Como yo no sé de fechas.

"P. ¿De días de la semana usted sabe? —Porque era que trabajábamos.

"P. ¿Se trabaja de lunes a viernes? —Sí, señor.

"P. ¿Y el sábado para cobrar y descansar? —Sí, señor.

"P. ¿El día de los hechos fue sábado o domingo? —No recuerdo si fue sábado o domingo. Sábado fue.

"P. Entonces Lydia, la novia de William, ¿estaba en tu casa ese día? —Yo no tengo casa. La casita mía es allá abajo en Planas. Ahí no tengo casa.

"P. ¿A dónde fuiste tú inmediatamente después del incidente ése, después de salir de la tienda y de haber sucedido eso, que te encontraste ese cuchillo y que te cayeron encima y te quitaron los $47.00? —A más ninguna parte. No recuerdo haber ido a ninguna parte.

"P. ¿Te quedaste allí? —Me fui en el carro con el herido de allí de la tienda de Emilio Olavarría.

"P. ¿Para dónde ibas, con qué propósito era que cogiste el carro? —Para el Distrito.

"P. El carro paró en el Distrito, ¿pero hasta dónde querías tú llegar? —Me trajeron a curar.

"P. ¿No fuiste al cuartel de la policía de Hatillo? —No, señor. Yo no recuerdo.

"P. ¿Fuiste al cuartel de la policía de Hatillo? —Sí, señor. Me dicen que estuve, pero no recuerdo. Le pregunté a mi mujer si me vino a traer y qué hicimos y me dijo que aquella noche me llevaron al cuartel y te hicieron mil preguntas y como estabas aturdido tú declaraste.

"P. ¿Tú no sabes si fuiste primero al cuartel? —Yo no recuerdo lo que yo hice.

"P. La casa de la novia de William queda cerca de la casa tuya? —Queda bien lejos la casa de la novia de William.

"P. ¿Es familia tuya o de tu mujer? —Yo no visitaba esa casa.

"P. ¿Era familia de tu mujer? —Sí, señor.

"P. ¿Era lejos la casa donde dormía y vivía la novia de William? —De la mujer que era mía.

"P. ¿Aquel señor rubio como un gallo te recuerdas de él? —Sí, señor.

"P. ¿Dónde él visitaba la novia? —Como él es casado con una prima mía y la dejó porque la abofeteaba y lo tuvo que dejar porque le daba mala vida y se quería con otra muchacha.

"P. ¿Ella es prima de su esposa? —La que le dije yo.

"P. ¿Y esta muchacha nueva? —Esta muchacha nueva que se quería con él.

"P. ¿Queda cerca de su casa? —No, señor.

"P. ¿Lejos? —Lejos.

"P. ¿Qué casa queda cerca de la casa de Lydia donde fuiste esa noche? —Ninguna.

"P. No hay ninguna otra casa cerca? —No, señor.

"P. ¿Qué mujeres gritaron allí cuando tú dijiste que habías matado a uno? —Yo en ningún momento dije que había matado a nadie.

"P. ¿O que heriste a uno? —Tampoco dije eso.

"P. ¿En qué momento dijiste que te habían herido a tí?

—Fue frente, más abajo de la tienda de Emilio.

"P. ¿Qué familia vivía allí? —Esa misma familia.

"P. ¿Qué familia? —La que usted dice.

"P. ¿La famillia de William? —La novia de William.

"P. ¿Allí no dijiste que te habían quitado los $47.00? —Seguro que no. En ese momento no dije nada.

"P. ¿Pero dijiste que te habían herido, que te habían herido a tí? —Seguramente que sí. Pero fue acá arriba, no allá abajo.

"P. ¿Y William salió de la casa? —No le puedo decir eso.

"P. ¿Él salió y estuvo contigo? —¿Dónde?

"P. ¿Para ayudarte a recoger el puñal? —No, señor. No me he visto con él buscando el puñal.

"P. Lo oíste declarar a él? —Sí, señor."

(T. E., págs. 97 a 100.)

Es indudable que la intervención del Juez en este caso fue mucho más lejos que la que desaprobamos en los casos de *Pueblo* v. *Acevedo*, 35 D.P.R. 966 y *Pueblo* v. *Bartolomei*, 70 D.P.R. 698. En el primero de ellos, dijimos a la pág. 970: ■

"Sin embargo, el conducir un caso por parte del Pueblo, especialmente en juicios por jurado, debe dejarse al fiscal. De lo contrario una intervención excesiva por parte de la corte en el curso general de las preguntas y comentarios hechos a favor de la acusación, produciría prejuicio en la mente del jurado contra el acusado y cuando se considera en relación con otras circunstancias del caso podría conducir a la conclusión inevitable en apelación de que el acusado no se le dio un juicio justo e imparcial." ■

En el caso de *Bartolomei* citamos con aprobación parte del lenguaje usado en el de *Pueblo* v. *León*, 53 D.P.R. 429, al efecto de que: "El Juez puede hacer a un testigo cualquier pregunta que crea necesaria para aclarar, en bien de la justicia, cualquier punto obscuro que pueda haber quedado después de los interrogatorios del fiscal y de la defensa; pero no debe examinar a un testigo con el propósito de contradecirlo o desacreditarlo ante el jurado. Esa misión está reservada al fiscal y a la defensa." ■

Para demostrar que el Juez en este caso trató de contradecir al acusado y de desacreditarlo ante el Jurado, basta recordar, además del interrogatorio sobre la manera como le sustrajeron la cartera al acusado, las siguientes preguntas:

"P. ¿Es un cuchillo o un puñal?   —Un puñal.

"P. ¿De eso usted sabe?   —Es un puñal."

Indudablemente que la pregunta no tenía otro propósito que el de presentar al acusado ante el jurado como un hombre que sabe de *puñales*, que es un arma que se usa para atacar.

"P. ¿Este mismo puñal fue el que encontró usted?   —Yo no sé si sería ése.

"P. ¿No acaba de decir que este puñal lo vio por primera vez en la tienda de Olavarría donde lo encontró?   —En la tienda no lo ví.   En el camino."

Esta era una pregunta dirigida a contradecir al testigo, o por lo menos, hacer resaltar el hecho de que el testigo incurría en una contradicción.   Pero más claro resulta el fin perseguido con el interrogatorio, de las siguientes preguntas:

"P. ¿No dijo que este puñal lo reconocía como de su propiedad?

"¿P. Con éste lo hirió?

"P. ¿Por qué dijo que no puede decir con cuál fue?

"P. ¿No dijo hace un momento, en otra ocasión, que no fue con éste, sino con otro?"

Creemos innecesario seguir analizando los intensos interrogatorios a que el Juez sometió a casi todos los testigos, para demostrar que sus actuaciones privaron al acusado de un juicio justo e imparcial.   El hecho de que se estuviera ventilando un caso de portar armas conjuntamente con el de asesinato, no justificaba la intervención del juez con los testigos en la forma que lo hizo.

*Se revocará la sentencia apelada y se ordenará la celebración de un nuevo juicio.*