EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* DAVID OTERO VALLE, acusado y apelante.

*Número:* CR-62-348     *Resuelto:* 30 de septiembre de 1963

*Armando A. Miranda,* abogado del apelante; *J. B. Fernández Badillo, Procurador General,* e *Irene Curbelo, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

El apelante David Otero Valle fue acusado de una infracción a la Sec. 5-801 de la Ley de Vehículos y Tránsito de

Puerto Rico, Ley Núm. 141 de 20 de julio de 1960, 9 L.P.R.A. sec. 1041, consistente en que manejaba un vehículo de motor bajo los efectos de bebidas embriagantes, lo que no le permitía tener el pleno dominio y control del mismo. Celebrado el juicio correspondiente, el tribunal le encontró culpable y pronunció sentencia condenándole a sufrir 15 días de cárcel, disponiendo además la suspensión de su licencia de conductor por el término de un año. Además manifestó que "tomando en consideración que no existen razones de clase alguna que justifiquen su negativa a dejarse tomar la muestra de sangre, le suspende la licencia por seis meses adicionales."

■ 1—Se queja el apelante en su primer apuntamiento de error de la intervención "inoportuna" del magistrado que presidió el proceso en el curso del contrainterrogatorio por la defensa. Hemos examinado los incidentes a que se refiere. El error imputado carece de méritos. La intervención del juez se dirigió a aclarar cierto aspecto de la prueba sobre el carácter rural o urbano del lugar donde el agente del orden público sorprendió al acusado conduciendo el vehículo en forma imprudente. En verdad se trataba de un aspecto del caso de escasísima pertinencia para la determinación de la responsabilidad criminal. *Pueblo* v. *Nieves Alvelo*, 89 D.P.R. 47 (1963); *Pueblo* v. *Martínez Acevedo*, 88 D.P.R. 199 (1963); *Pueblo* v. *Aletriz*, 85 D.P.R. 646 (1962). Además, ningún perjuicio se causó si se considera que el proceso no se ventiló ante un jurado, *Pueblo* v. *Rodríguez Ocaña*, 88 D.P.R. 335 (1963).

■ 2—Tampoco tiene méritos el segundo error que se dirige a impugnar la suficiencia de la prueba. El testimonio del policía que practicó la detención del acusado, de ser creído —como en efecto lo fue—sostiene la convicción. El apelante, cuya ocupación era la de propagandista para la venta de ron, conducía una guagua comercial, como a la una de la madrugada, por la Carretera Militar, "frenaba . . . volvía y aceleraba y volvía y tocaba bocina", continuó la marcha cuando el

carro de la patrulla policíaca tocó la sirena para advertirle que se detuviera. Al ser finalmente detenido después que la patrulla le persiguió por varios hectómetros, y le interceptó la marcha, se desmontó, pudiendo observarse que hablaba incoherentemente, se conducía en forma colérica y despedía un fuerte aliento alcohólico. Al preguntársele si había ingerido bebidas embriagantes respondió que "se había dado unos cuantos palos pero eso era porque él vendía licor." Esta prueba satisface cabalmente nuestra reiterada norma sobre el particular. *Pueblo* v. *Vélez Ruiz*, 89 D.P.R. 53 (1963), y casos allí citados, cf. *Pueblo* v. *Zalduondo Fontánez*, 89 D.P.R. 64 (1963).

3—En el curso del interrogatorio el policía que detuvo al acusado manifestó que inicialmente éste accedió a que se le tomara una de las muestras a que se refiere la ley para practicar un análisis químico, por lo cual le condujo al Centro de Salud de Vega Baja. Allí, en presencia del doctor Guillermo Saadé el acusado se negó. Ante esta negativa, el agente indica que "[l]e expliqué la ley, que sino [*sic*] se dejaba sacar la orina o sangre o aliento y el Tribunal lo encontraba culpable que se podía suspender la licencia por dos años." Persistió en su negativa.

El tercer error señalado por el apelante impugna la suspensión adicional de la licencia para conducir vehículos de motor que el tribunal decretó fundándose en la negativa a dejarse tomar muestras de la sangre o la orina. Afirma que: a) no había en la acusación ninguna alegación que imputara al acusado haberse negado injustificadamente a dejarse sacar la muestra para el análisis; b) tal determinación no puede ser hecha por .el tribunal sentenciador sin ofrecerle antes una oportunidad para explicar específicamente las razones que indujeron su negativa; y, c) al acusado lo único que se le imputó en la acusación, de lo cual estaba preparado para defenderse, fue de una infracción a la Sec. 5-801 la cual ni en sí ni en

la cláusula relativa a las penalidades que apareja contiene disposición alguna en cuanto a la suspensión de la licencia por un término adicional, violándose así sus derechos constitucionales "respecto a la información que debe dársele en la acusación."

Precisa hacer un recuento de la legislación sobre este aspecto de la ley para comprender mejor la improcedencia del planteamiento.

El delito de conducir un vehículo de motor en estado de embriaguez se incorporó específicamente a nuestro Derecho Penal mediante la adopción del Art. 13 de la Ley Núm. 279 de 5 de abril de 1946 (Leyes, págs. 599, 637).[1] En 1 de abril de 1953 el Gobernador de Puerto Rico dirigió un mensaje a la Asamblea Legislativa expresando su "gran desasosiego por las proporciones alarmantes que ha asumido el creciente número de accidentes automovilísticos que vienen ocurriendo en las carreteras" y expresó que "el gobierno puede prevenir una parte de tales accidentes *haciendo más severas* las leyes que penalizan la conducción negligente." Entre otras normas generales, propuso que "toda persona que incurra en el delito de conducir un vehículo de motor en estado de embriaguez sea condenada a cárcel, sin alternativa de multa."[2] Estas sugestiones ejecutivas fueron consideradas detenidamente y se concluyó que "lo procedente antes de aprobar dicha legislación era hacer los estudios y las investigaciones necesarias para establecer en nuestra legislación procedimientos científicos mediante los cuales se pudiera determinar el estado de embriaguez de los delincuentes de modo que las cortes pudieran disponer de todos los medios de evidencia adicionales que pudieran garantizar los derechos del ciudadano inocente, y a

---

[1] Este artículo se enmendó mediante la Ley Núm. 156 de 26 de abril de 1951 (Leyes, pág. 369) para aumentar de veinticinco a cien dólares la multa mínima en caso de convicción.

[2] *Diario de Sesiones*, 1953, Vol. II, tomo 3, pág. 1718.

la sociedad y al estado proveérseles los medios que condujeran a la convicción de los culpables. (³)

Como resultado del estudio legislativo, y para el propósito anunciado de reconciliar el interés de la comunidad y garantizar los derechos del ciudadano contra posibles excesos en la aplicación de la ley, se aprobó la Ley Núm. 95 de 29 de junio de 1954 (Leyes, pág. 993), cuya principal innovación consistió en introducir el sistema de exámenes químicos para determinar el grado de intoxicación alcohólica de los conductores. (⁴) Proveyó el procedimiento para la toma de las muestras, determinó el efecto probatorio del resultado de los exámenes, y ante la posibilidad de la negativa de un detenido a someterse al examen requerídole, dispuso:

"7. Si dicha persona una vez haya sido arrestada y subsiguientemente requerida a someterse a dicho análisis químico, rehusare someterse al mismo, el análisis no le será hecho. El oficial del orden público que practicó el arresto llevará a la persona arrestada ante un Magistrado quien, después de investigar el caso y de oir, bajo juramento, al oficial del orden público, a la persona arrestada y a cualquier otra persona interesada, ordenará, si existiere causa probable, que se radique la correspondiente denuncia

---

(³) Informe de la Comisión Especial sobre Tránsito sobre el P. de la C. 1250, que luego se convirtió en la Ley Núm. 95 de 29 de junio de 1954. *Diario de Sesiones*, 1954, Vol. IV, tomo 3, pág. 1486.

Consistente con este propósito legislativo, el Representante señor Ramos Mimoso se expresó en la siguiente forma: ". . . . esta Legislatura no puede estar, bajo circunstancia alguna, en plan de defender a esos individuos que viven al margen de la ley. La obligación nuestra se descarga a cabalidad dándoles a ellos todas las garantías para que se defiendan en la Corte, *pero no facilitándoles, más allá de lo normal y de lo razonable, las defensas, y dificultándole al Estado los medios de establecer su culpabilidad en un tribunal.*" (*Diario de Sesiones*, op. cit., pág. 1517.) Y el Representante Figueroa, haciéndose eco de la voluntad legislativa, indicó que "Pero garantizar el orden y establecer justicia no es abrirle las puertas a los acusados para que *puedan tener ventajas por donde salir al amparo de un tecnicismo legal.*" (*Diario de Sesiones*, op. cit., pág. 1517.)

(⁴) En relación con la constitucionalidad de estatutos que autorizan análisis químicos para determinar el grado de intoxicación alcohólica, véase el escolio 4 de la opinión emitida en *Pueblo v. Tribunal Superior*, 84 D.P.R. 392 (1962).

o acusación ante el Tribunal de Primera Instancia contra la persona arrestada."

Se estableció además un procedimiento administrativo para la suspensión por el Secretario de Obras Públicas de la licencia de aquellos conductores que se negaren a someterse al análisis químico. Este procedimiento se iniciaba con la remisión por el magistrado al Secretario de Obras Públicas de copia de las declaraciones juradas prestadas, y éste, "basándose en las declaraciones juradas prestadas ante el Magistrado, suspenderá la licencia o permiso de conductor de la persona arrestada . . ." El perjudicado podía solicitar una vista dentro de sesenta días para determinar si había estado justificado al rehusar someterse a examen.

Al aprobarse la actual Ley de Vehículos y Tránsito de 1960 (Ley Núm. 141 de 20 de julio de 1960) se conservó sustancialmente el procedimiento que había de observarse cuando la persona arrestada se negare a someterse al análisis químico. Véase al efecto la Sec. 5-804 (9 L.P.R.A. sec. 1044). Los cambios principales introducidos consistieron en: a) especificar el contenido de las declaraciones juradas del agente del orden público que practica la detención o del agente a cargo inmediato, del puesto o zona donde se efectúa el arresto, *con particular énfasis en el hecho del requerimiento al detenido para que se someta al análisis, su negativa y el apercibimiento a éste de las consecuencias de su negativa* (suspensión o cancelación de la licencia); (5) b) disponer que se entregará copia de las declaraciones juradas al detenido, a su requerimiento; y c) *eliminar el procedimiento ante el Secretario de Obras Públicas para la suspensión de la licencia con motivo de la negativa a someterse a examen y tras-*

---

(5) *Diario de Sesiones*, 1960, págs. 2213–2220. El Representante señor Concepción de Gracia, autor y principal defensor de la enmienda, justificó la inclusión de la disposición mencionada arguyendo que la generalidad de las personas de más escasa instrucción, que incluye a la mayor parte de los conductores de automóviles de servicio público y taxímetros, no estaba consciente de las consecuencias de la negativa.

*lado de esta facultad al tribunal que entiende en la infrac-*
*ción por conducir un vehículo de motor en estado de embria-*
*guez.* En cuanto a este último particular es conveniente con-
signar que el proyecto que finalmente se convirtió en la Ley
141 (Sustituto al P. del S. 304) disponía en su Sec. 5-805
el procedimiento administrativo para la suspensión de la
licencia cuando el conductor se negaba a someterse a examen;
y que en términos generales, era muy similar al anterior-
mente establecido en 1954. Así permaneció el proyecto hasta
que en las postrimerías de la discusión en la Cámara de Re-
presentantes en 22 de junio de 1960 se propuso la eliminación
de la vista administrativa ante el Secretario de Obras Públi-
cas y su traslado al tribunal que interviniera en la infrac-
ción. *Diario de Sesiones,* 1960, pág. 2227.

██    Claramente se deduce que se trata de procedimien-
tos paralelos, separados; uno, de la competencia exclusiva de
la esfera judicial, para cuya disposición se requiere el cumpli-
miento de las disposiciones sobre el encausamiento criminal;
y el otro, de naturaleza puramente administrativa, que no se
inicia mediante la presentación de la acusación. En *Pueblo* v.
*Tribunal Superior,* 86 D.P.R. 834 (1962), dijimos: "Se trata
de dos situaciones de hecho distintas que deben ser estableci-
das con hechos diferentes; la primera se refiere a la comisión
de un delito público; la segunda a la disposición administra-
tiva de una licencia otorgada por el Estado." En el proceso
criminal corresponde al Estado probar, fuera de duda razona-
ble, que el acusado conducía un vehículo de motor bajo la
influencia de bebidas embriagantes. En el procedimiento ad-
ministrativo solamente debe establecerse "la conducta in-
justificada del conductor al no dejarse tomar las muestras
requeridas," *Pueblo* v. *Tribunal Superior,* supra, o sea a)
el requerimiento héchole para la toma de las muestras; b) su
negativa; y, c) que se le hicieron las advertencias de las con-

secuencias que tal negativa conlleva. (⁶) Es por eso que, conforme al principio de la separabilidad de actuaciones, la licencia puede ser revocada aunque el acusado salga absuelto de la comisión del delito, y a la inversa, puede ser convicto y sin embargo no suspendérsele la licencia por el término adicional que provee la Sec. 5-804 (c), 9 L.P.R.A. sec. 1044 (c), si el tribunal estima que la explicación para rehusar someterse a la toma de las muestras es satisfactoria.

En el presente caso la prueba demostró que el agente que practicó la detención requirió al apelante Otero Valle para que se dejara sacar las muestras, que éste rehusó, y se le apercibió que su negativa podía conllevar la suspensión de la licencia. (⁷) Correspondía entonces al apelante demostrar que había justificación para su negativa. No lo hizo. Es más, de la prueba surge afirmativamente que no había tal justificación, pues al requerírsele inicialmente accedió a ello, y fue luego, al conducírsele ante el médico, que expresó su negativa. Además, si el apelante deseaba explicar su negativa, y no estaba preparado en el acto del juicio, pudo así indicarlo al tribunal, indicando la prueba de que disponía. Prefirió no hacerlo. No puede quejarse de su propia indiferencia.

Como hemos indicado, se trata de dos procedimientos separados. Es por eso que la acusación por conducir en estado de embriaguez no tiene que contener alegación alguna en relación con la negativa a dejarse tomar las muestras. Los plan-

---

(⁶) Bajo la legislación anterior, el Secretario de Obras Públicas a base de las declaraciones juradas tomadas ante el magistrado investigador, copia de las cuales se le remitían, determinaba si procedía la suspensión de la licencia, lo cual comunicaba al conductor. Si el perjudicado deseaba impugnar esta actuación administrativa podía solicitar la celebración de una vista para en la cual "sólo se determinaría si el chófer o conductor estuvo justificado al rehusar someterse al examen." Sec. 1 de la Ley Núm. 95 de 29 de junio de 1954 (Leyes, pág. 993).

(⁷) No fue correcta enteramente la advertencia que se le hizo al apelante, pues el policía le indicó que si "el Tribunal *lo encontraba culpable* se le podía suspender a licencia por dos años." Por supuesto que esto en nada le perjudicó.

teamientos del apelante parten de la premisa errónea de que este último aspecto que se deriva de las actuaciones del conductor es de naturaleza penal, y por tanto, no puede prevalecer. [8]

*Se confirmará la sentencia dictada por el Tribunal Superior, Sala de Bayamón, en 28 de septiembre de 1961.* [9]

---

[8] Aunque se trataba de una acción civil en la cual uno de los elementos de negligencia imputada era la conducción de un vehículo de motor bajo la influencia de bebidas alcohólicas, creemos conveniente señalar que en *Sask. Mut. Ins. Co.* v. *Lyle*, 19 D.L.R.2d 134 (1959), se dijo que para probar la comisión del delito en la acción penal no era admisible en evidencia prueba sobre la negativa del conductor a tomarse las muestras, ya que el propio estatuto le concedía el derecho a rehusar hacerlo.

[9] Para los fines de la discusión hemos presumido que el pronunciamiento suspendiendo la licencia por un término adicional fundándose en la negativa a dejarse tomar las muestras es revisable dentro del recurso de apelación.